WATKINS, Judge.
Defendant, the State of Louisiana, Department of Environmental Quality (DEQ), appeals a judgment finding it liable to plaintiff, Gulf South Business Systems and Consultants, Inc. (Gulf South), for violations of the Unfair Trade Practices and Consumer Protection Law. -(LSA-R.S. 51:1405 et seq.)
Gulf South is a vendor of modular office panels and furniture. It filed suit against the DEQ and Prison Enterprises[1] on theories of interference with contractual relations and violations of the Unfair Trade Practices Act. Gulf South was granted a judgment *699 against the DEQ only and the DEQ has appealed. On appeal it is Gulf South’s contention that the DEQ used unfair and deceptive practices to prevent Gulf South from receiving a contract with Jimmy Swaggart Ministries (Ministries) to provide modular panels for an office building being renovated by the Ministries for lease by the DEQ.
In July of 1990, the Ministries became the successful low bidder for a five-year lease with the DEQ. The lease required the Ministries to accomplish a major “build out” of the existing structure prior to occupancy by DEQ on April 1, 1991. A substantial part of the build out was the partitioning of the office space which was to be a combination of traditional and open plan design.[2] Although the lease gave the Ministries the option of traditional versus open plan design, the Ministries was interested in optimizing the use of the open plan design with modular partitions because of the ease of returning the building to its original condition when the lease ended. After the lease was awarded to the Ministries, it began working with the DEQ on establishing a workable floor plan. Soon after the collaboration began, several issues concerning the partitions came to light. First, the DEQ wanted partition panels that would accept component modular furniture, such as work surfaces and shelving which it planned to purchase. Because the lease did not specify this type of panel and because of the additional cost of the component panels, the Ministries wanted to supply only basic room dividing panels without the capability of accepting component pieces.[3] Second, a debate arose as to which party would own the panels at the end of the lease. Third, it was discovered that the sizes and methods of attaching the modular pieces to the panels were not standardized but were what is referred to in the industry as “proprietary furniture.” Thus, the component pieces would not work unless purchased from the same manufacturer that made the panels.[4] Consequently, the DEQ requested that the Ministries allow Prison Enterprises to give price quotes on the panels because the DEQ would be purchasing all the component pieces from Prison Enterprises. Fourth, it was discovered that Prison Enterprises could not sell directly to the Ministries.
During this time, before signing the lease agreement, the Ministries and its representatives were determining whether it could meet the needs of the DEQ and stay within its budget. The task involved pricing the numerous aspects of the build out including the partitions. Several individuals became involved in this task, including the Ministries’ real estate broker, Joann Osborne, and also Gary Ryder, a representative of Tudor Construction Company.[5] Ms. Osborne and Mr. Ryder solicited pricing from Gulf South and Prison Enterprises. When Prison Enterprises submitted its pricing, it noted that it would sell directly to the DEQ.[6] These prices were secured between August and mid-October of 1990, and no further pricing of panels by the Ministries occurred until late November of 1990 when the architectural firm hired by the Ministries requested a *700 bid from Gulf South and Prison Enterprises.[7] The lease was signed by the Ministries and the DEQ on October 9, 1990, but it was not approved by the Division of Administration until November 16, 1990.[8]
Between mid-October and late November, the DEQ and the Ministries discussed the possibility of the DEQ’s purchasing the panels directly from Prison Enterprises to avoid compatibility problems when it purchased the component shelving and accessories and to save money.[9] Gulf South was aware of the DEQ’s concern about compatibility; however, Mr. Robert Shreve, president and part owner of Gulf South, testified that notwithstanding this knowledge Gulf South did not inform the Ministries or the DEQ about product compatibility during the bid process. Furthermore, Mr. Shreve explained that Ha-worth, the panel manufacturer, would not necessarily warrant its panels with another manufacturer’s components.
In early November of 1990, Ms. Janet Smith, a representative of the DEQ for this project, requested pricing from Prison Enterprises and Gulf South[10] based on typical configurations. The average price for a Ha-worth (Gulf South) work station was $183.00 more than a Prison Enterprise work station. According to her testimony, Ms. Smith was not authorized to approve a contract with either Gulf South or Prison Enterprises. Based upon these calculations and the issue of compatibility, she recommended to her boss, Cy Buchert, that the panels be purchased from Prison Enterprises by the DEQ.
It was not until December 10, 1990, when the DEQ received the final floor plans from the Ministries, that Mr. Buchert, undersecretary with the DEQ, requested an amendment to the lease to allow the DEQ to provide the panels in exchange for a reduction in the monthly rental. On December 11, 1990, Mr. Swaggart signed a memorandum of understanding with the DEQ which included, among twelve other items, a declaration that “DEQ will be responsible for the purchase, delivery, installation and maintenance of the panels.” The DEQ signed the memorandum on January 29, 1991. The lease amendment was signed by the parties and approved by the Division of Administration on March 5, 1991.
Based on these facts the trial court awarded the plaintiff damages in the amount of $49,400.00 for lost profits, and $15,000.00 in attorney’s fees resulting from the DEQ’s violation of the Unfair Trade Practices and Consumer Protection Law. The DEQ appealed, alleging several factual and legal errors, all of which involve the principal issue of whether the actions of the DEQ constituted a violation of the Unfair Trade Practices and Consumer Protection Law which caused damages to the plaintiff, Gulf South.[11]
The trial court’s reasons for finding liability on the part of the DEQ are based primarily on the following factual findings:
So we have here DEQ knowing on November 8th — on or about November 8th that they were entering into a contract which provided the option of the [lessor] to provide whatever type of partitions it *701 wished, and the [lessor] did not have to provide partitions that could support work stations. Knowing that, they entered into a contract November 16th which a reasonable and prudent person should have realized that the [lessor] would be undertaking and contracting with someone else for these partitions, and, in fact, since Gulf South was the only legal bid, it — there’s no doubt in the court’s mind that since Prison Enterprises could not sell to Jimmy Swag-gart and Gulf South was the only entity that Jimmy Swaggart was contracting with that Gulf South had the business with Jimmy Swaggart, but for the action of DEQ in using its position to modify the contract to obtain what it wanted originally, which was furniture from Prison Enterprises off of which it could hang work stations. I find that to be an unfair trade practice.
Although the trial court concluded that the DEQ was not liable for tortious interference with contractual relations, it found the DEQ hable for violations of the Unfair Trade Practices and Consumer Protection Law. We believe the court erred in finding the actions of the DEQ unlawful under the Unfair Trade Practices Act and Consumer Protection Law, and at the same time finding the actions acceptable as a defense to a claim of tortious interference with contract.
INTERFERENCE WITH CONTRACT
In 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989), the Louisiana Supreme Court recognized the possibility of a narrowly drawn action for intentional interference with contractual rights and indicated that it would proceed -with caution in expanding that cause of action. Great S.W. Fire Ins. Company v. CNA Ins. Companies, 557 So.2d 966 (La.1990). In Spumey, the Louisiana World Exposition, Inc, (LWE), contracted with 9 to 5 Fashions to supply uniforms for the fair employees. When the fair ended, 9 to 5 Fashions was unable to collect under the contract because LWE was in bankruptcy. Thereafter, 9 to 5 Fashions sued Spur-ney, a chief executive officer of LWE, alleging that he had damaged 9 to 5 Fashions by intentional and negligent interference that hindered its performance of the contract. The court addressed plaintiffs claims as follows:
It is the basic policy of our law that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La.Civ.Code art. 2315. The framers conceived of fault as a breach of a preexisting obligation for which the law orders reparation, when it causes damage to another, and they left it to the courts to determine in each case the existence of an anterior obligation which would make an act constitute fault. 2 M. Planiol, Treatise on the Civil Law, Part 1, Secs. 863-865 (1959); Pitre v. Opelousas General Hosp., 530 So.2d 1151 (La.1988).
Referring to these basic principles, we conclude that, in the light of modern empirical considerations and the objectives of delictual law, an officer of a corporation owes an obligation to a third person having a contractual relationship with the corporation to refrain from acts intentionally causing the company to breach the contract or to make performance more burdensome, difficult or impossible or of less value to the one entitled to performance, unless the officer has reasonable justification for his conduct.
538 So.2d at 231.
The court specifically limited its foray into the common law doctrine of interference with contract, stating:
It is not our intention, however, to adopt whole and undigested the fully expanded common law doctrine of interference with contract, consisting of “a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way.”
538 So.2d at 234.
Instead, the court recognized “only a corporate officer’s duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person.” 538 So.2d at 234. Furthermore, the court specifically repudiated recovery based upon negligent interference with contract. The court noted:
*702 Interference with contract, which had its modern inception in malice has remained almost entirely an intentional tort; and, in general, liability has not been extended to the various forms of negligence by which performance of a contract may be prevented or rendered more burdensome.
538 So.2d at 232.
In the instant case discussions between the DEQ and the Ministries began as early as October of 1990 regarding the possibility that the DEQ would purchase the panels. The testimony of the witnesses in this matter established that the Ministries was not opposed to this change in the lease and that the Ministries was not forced or coerced in any way to amend the lease. To the contrary, the testimony of Mr. Anderson revealed that the Ministries was relieved that it would not be responsible for purchasing and installing the panels.[12]
Furthermore, the DEQ was under statutory mandate to procure goods and services for the lowest available cost, with Prison Enterprises being the vendor of choice if its costs were proven to be lower than those prices available through central purchasing.[13] The facts of the instant case reveal that this was the course of action taken by the DEQ. Although the methods to accomplish this result may have been fraught with indecision as the DEQ tried to comply with the statutory requirements, we believe that its actions were neither intentionally harmful nor unjustified. Accordingly, without addressing the question of whether the relationships between the parties in the case sub judice bring Gulf South’s cause of action within the parameters of the Spumey holding, we find that the trial court was correct in finding that the plaintiff failed to establish a claim for intentional interference with contract.
UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
LSA-R.S. 51:1405(A) provides that “[ujnfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” The broad language of this statute necessarily requires a case-by-case determination of what constitutes an unfair trade practice. Roustabouts, Inc. v. Hamer, 447 So.2d 543 (La.App. 1st Cir.1984). A practice is considered unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers, and consumers include business competitors. Roustabouts, 447 So.2d at 548. LSA-R.S. 51:1409 confers a private right of action on “[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal,” from unfair trade practices.
The law requires the deceptive or unfair act to be one in the course of “trade” or “commerce.” LSA-R.S. 51:1402(9) defines “trade” or “commerce” as “the advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state.” The DEQ’s actions in this case were not acts in the course of *703 “trade” or “commerce” as defined under the act. The DEQ was a consumer in this ease, and as so often happens, the consumer changed its mind to the chagrin of the seller. This, however, does not amount to an unfair trade practice.
For the reasons stated, we reverse the trial court judgment against the DEQ. All costs of this proceeding are to be paid by the plaintiff, Gulf South.
REVERSED AND RENDERED.
SHORTESS, J., concurs.

. Prison Enterprises is an agency of the state and in this case a vendor of modular furniture and partitions. Plaintiff's Exhibit 17, entitled PRISON ENTERPRISES MISSION STATEMENT, reads as follows:
The mission of Prison Enterprises is to reduce the overall costs of prison operations, state agencies, local government entities, and tax supported institutions by operating self-supported industrial, service, and agricultural businesses which:
* Employ inmates in meaningful jobs
* Teach marketable skills and good work habits
* Provide quality, cost-effective products and services
* Do not unreasonably compete with Louisiana businesses
* Reflect a philosophy of integrity and otherwise come as close as possible to business operations in the private sector

. Open plan design is the use of free standing wall partitions without traditional doors and door frames.

. Originally the DEQ had planned to use free standing furniture in the leased building. However, because of an increase in the DEQ workforce and the space requirements of free standing furniture, the DEQ decided to maximize its use of modular panels and furniture to accommodate all of its personnel.

. Evidence was presented by both parties on whether the DEQ could use component pieces from Prison Enterprises on panels manufactured by Gulf South. Suffice it to say that although in some instances it would have been possible to purchase components from yet a third manufacturer that would permit some interchange, it was more efficient and economical to use panels and components from the same manufacturer. Furthermore, it was shown that the interlocking nature of modular furniture would create warranty problems when components from different manufacturers were combined.

. Tudor Construction Company was brought into the project in mid-September and asked to assist, with the idea that it would be awarded the construction contract. Tudor Construction assisted with the preliminary plans but was never awarded a contract.

. These prices were based on a sample floor plan of one of the six proposed floors of the leased building.

. Mr. Dale Songy, a partner in the architectural firm, testified that the solicitation for bids was at the request of the Ministries and not the DEQ.

. LSA-R.S. 39:1641 A. provides in part:
All contracts and agreements for the lease or rental of space for the housing of state agencies, their personnel, operations, equipment, or activities shall be made in the name of and by the authorized representative or representative body of the state agency but shall be made and entered into only with the approval of the commissioner of administration.

. Mr. Robert Anderson, the vice-president of the Ministries and director of purchasing, testified that he was the Ministries’ representative in the discussions with the DEQ concerning the amendment to the lease and that the Ministries were agreeable to the amendment because it would “get us (the Ministries) out of a bind on delivery.”

. Ms. Smith included Gulf South in her pricing requests after she contacted the state's central purchasing and was advised that because central purchasing did not have an existing state contract for modular partitions, the DEQ would need to seek a comparison on the open market to ensure that Prison Enterprises was the least costly option.

. Gulf South has not appealed nor answered the appeal; therefore, the trial court judgment in favor of Prison Enterprises is final and will not be addressed on appeal.

. Because the lease agreement provided for $4,000.00 per day liquidated damages if the building was not ready for occupancy on April 1, 1991, the Ministries was agreeable to allowing the DEQ to provide and install the panels.

. According to the Louisiana Procurement Code all purchases by state agencies, except those agencies specifically exempted, are transferred to the central purchasing agency. LSA-R.S. 39:1571, 39:1572. Additionally, LSA-R.S. 39:1593 provides that unless otherwise authorized by law, all state contracts shall be awarded by competitive sealed bidding. However, this requirement is subject to the following exceptions:
LSA-R.S. 39:1703 provides that "[a]ny public procurement unit may sell to, acquire from, or use any supplies belonging to another public procurement unit or external procurement activity independent of the requirements of Part III of this Chapter or of Title 38." LSA-R.S. 15:1157 A.(l) provides that "state agencies other than the Department of Public Safety and Corrections shall purchase, if available, goods and services from prison enterprises at a price which reflects the cost to the department of producing the goods or providing the services, if the prices are less than those of central purchasing."