725 So.2d 496 (1998)
INKA'S S'COOLWEAR, INC. d/b/a S'Coolwear
v.
SCHOOL TIME, L.L.C. d/b/a School.
No. 97-CA-2271.
Court of Appeal of Louisiana, First Circuit.
November 6, 1998.
*497 MacAllyn J. Achee, Baton Rouge, for Plaintiff-Appellant Inka's S'Coolwear, Inc. d/b/a S'Coolwear.
Peter J. Losavio, Jr., Ann T. Franques, B. Wesley Pitts, Baton Rouge, for Defendant-Appellee School Time L.L.C. d/b/a School Ware.
Before: FITZSIMMONS and GUIDRY, JJ., and CHIASSON, J. Pro Tem.[1]
GUIDRY, J.
Plaintiff, Inka's S'Coolwear, Inc. d/b/a "S'COOLWEAR," appeals from the trial court's judgment of dismissal failing to enjoin *498 the defendant's, School Time, L.L.C., d/b/a "SCHOOL WARE" use of its trade name, "SCHOOL WARE." The trial court held: 1) plaintiff did not have a proprietary interest in the name "S'COOLWEAR," thereby establishing trade name infringement, 2) defendant's actions did not constitute tortious interference with a contract due to its prior contractual agreement with Kehoe-France, and 3) defendant's exclusive contract with Industrial Garment Manufacturing did not constitute unfair trade practices. We affirm.

PROCEDURAL HISTORY
On June 25, 1996, plaintiff filed suit against defendant seeking injunctive relief and damages. The plaintiff alleged trade name infringement, unfair trade practice and tortious interference with a contract. In response, the defendant filed an answer and reconventional demand for injunctive relief and damages. On July 24, 1996, the trial court heard these matters and on August 20, 1996, the court entered a judgment dismissing the plaintiff's petition for injunctive relief and damages, as well as the defendant's reconventional demand for injunctive relief and damages. On August 29, 1996, the plaintiff-appellant filed a motion for new trial. The trial court denied the motion for new trial on September 4, 1996.
This appeal is taken from the trial court's dismissal of the plaintiff-appellant's petition for injunctive relief and damages.

FACTS
In October of 1995, Mrs. Inka Mims formed "Inka's S'COOLWEAR" as the principal incorporator and registered the trade name under the laws of the State of Louisiana. Prior to forming her business, Mrs. Mims was employed for over eighteen years with Young Fashions, a school uniform retailer. After her employment with Young Fashions, Mrs. Mims obtained employment with School Time L.L.C., another school uniform retailer, where she served as an employee and minority stockholder from October 1993, until June 1995. As part of her employment, Mrs. Mims negotiated contracts for the sale of school uniforms with various private schools in the Baton Rouge and Metairie/New Orleans areas. Pursuant to the contracts, School Time L .L.C. would supply the schools' uniforms and obtain authorization to place the schools' logos on the uniforms. Shortly after leaving School Time L.L.C. in June of 1995, Mrs. Mims decided to open her own retail business to supply school uniforms to local schools. Mrs. Mims came up with the name "Inka's S'COOLWEAR" and began using the trade name as a means of soliciting business as early as September of 1995.[2]
When Mrs. Mims left her job with School Time L.L.C., she took a copy of a contract that the appellee had with Kehoe-France, a private school that purchased uniforms from the appellee. Thereafter, Mrs. Mims made efforts to contact Kehoe-France as a prospective client. Mrs. Mims informed Kehoe-France that it could contract with "Inka's S'COOLWEAR," because she had taken the contract evidencing the agreement between School Time L.L.C. and Kehoe-France. Based on the solicitations from Mrs. Mims, Kehoe-France began placing orders with "Inka's S'COOLWEAR." Employees of "School Time L.L.C. SCHOOL WARE" searched for the contract evidencing the agreement in order to enforce its rights, but they were unable to find the contract in the company files. Eventually, "School Time L.L.C. SCHOOL WARE" employees obtained a copy of the contract from a third party and sought to enforce the company's rights under the contract. The three parties ultimately formed an agreement whereby Kehoe-France would purchase a portion of its uniforms from "School Time L.L.C. SCHOOL WARE" and the remainder from "Inka's S'COOLWEAR."
During a trade show that was held on January 20 and 21 of 1996, in Biloxi, Mississippi, the appellant alleges that the appellee became aware of the impact that the name "Inka's S'COOLWEAR" had on the school uniform industry. Mrs. Mims attributes the success of her company, at least in part, to her trade name "S'COOLWEAR." The appellant contends that, during the trade show, the appellee decided to use the name *499 "SCHOOL WARE" as part of its trade name due to the success that the appellant was having with the name "S'COOLWEAR."
Alternatively, the appellee contends that its decision to add "SCHOOL WARE" to its name had nothing to do with the name "Inka's S'COOLWEAR," because the appellee was not aware of the appellant's trade name, and the appellant had no displays bearing its trade name "Inka's S'COOLWEAR" during the trade show. The appellee stated that its reason for developing the name "SCHOOL WARE" was due to its concept for a general store that would provide retail school supplies as opposed to school uniforms. On January 22, 1996, the appellee registered a revised name with the Secretary of State. The trade name was changed from "School Time, L.L.C." to "School Time, L.L.C. SCHOOL WARE." After the name was registered by the appellee, it began using the name "SCHOOL WARE" to solicit business for its school supply division, "SCHOOL WARE." Appellee contends it did not know of appellant's name until February 4, 1996, when a "School Time L.L.C. SCHOOL WARE" employee saw an "Inka's S'COOLWEAR" advertisement at an open house held at Our Lady of Mercy School. There, the appellant had a booth displaying her trade name and handed out correspondence with the name "Inka's S'COOLWEAR."
The appellee listed its name in the Baton Rouge telephone directory as "SCHOOL WARE," pursuant to its revised name. This is alleged to have caused confusion for some of the customers and prospective clients of the appellant who were given the phone number to "School Time L.L.C. SCHOOL WARE" as opposed to "Inka's S'COOLWEAR." The confusion allegedly occurred occasionally when clients or prospective clients tried to contact the appellant using the Baton Rouge directory assistance with the name pronounced "S'COOLWEAR" which is pronounced the same as the name "SCHOOL WARE." At this time, Mrs. Mims had the name "S'COOLWEAR" included in the Baton Rouge telephone directory, in addition to "S'COOLWEAR, Inka's" which had previously been listed in the directory. This listing was only for the Baton Rouge area because the appellant listed its name in the Metairie/New Orleans telephone directory as "Inka's S'COOLWEAR."
Mrs. Mims' store opened on June 17, 1996. Mrs. Mims states that it began a structured advertising campaign as early as January of 1996. During the campaign drive, the appellant used the trade name "Inka's S'COOLWEAR" on letterhead, business cards, signs at the appellant's business locations, "joker tags" printed inside the appellant's clothing, and on the appellant's internet site. All but one advertisement bears the name "Inka's S'COOLWEAR." In July of 1996, the name "S'COOLWEAR" was used in a magazine advertisement; however, the appellant stated that the full name "Inka's S'COOLWEAR" should have been used. This appears to be the only instance, in this case inadvertently, where the appellant used solely the name "S'COOLWEAR" for advertisement purposes other than in the Baton Rouge telephone directory.
The competition between the two companies continued and on occasion School Time L.L.C. would contact prospective clients under the name "SCHOOL WARE." The appellant avers that it began to lose a portion of its market share as a school uniform retailer and concluded that the demise of its market share was due in large part to the confusion between the names "S'COOLWEAR" and "SCHOOL WARE," even though schools allegedly inform the students' parents of the appropriate retailer by providing the retailers' names, addresses and phone numbers.

ASSIGNMENTS OF ERROR
The plaintiff-appellant alleges the following assignments of error for our review:
1) Whether the trial court committed reversible error by finding that it was necessary for appellant, "Inka's S'COOLWEAR" to prove under the law that there was a "secondary meaning" to "S'COOLWEAR."
2) Whether it was reversible error for the trial court to find that there was no unfair trade practice or tortious interference with *500 the contract by the appellee, "School Time L.L.C. SCHOOL WARE."
3) Whether the trial court erred by not assessing damages for trade name infringement, unfair trade practice (treble damages) and for tortious interference with a contract.

DISCUSSION

A. Trade Name Infringement
Under unfair trade competition law, the purpose of protection against trade name infringement is three fold. First, the law is designed to protect an owner who claims interest and benefits of goodwill from a trade name; next, the law is designed to protect the consuming public, and lastly, the law is designed to encourage competition. Gulf Coast Bank v. Gulf Coast Bank and Trust Company, 94-2203 (La.4/10/95), 652 So.2d 1306, 1318 (citing Union National Bank of Texas, Laredo, Texas v. Union Nat'l Bank of Texas, Austin, Texas, 909 F.2d 839, 843-844 (5th Cir.1990) 1 McCarthy, § 2.01; Restatement, secs. 9, comments c & d, 12, comment b). A court must balance these interests in deciding any unfair competition or trade name infringement case. Gulf Coast Bank, 652 So.2d at 1319.
"The primary issues in a trade name infringement case are: (1) whether the party seeking the injunction has a protectable proprietary right in the name it seeks to exclude others from using, and (2) if so, whether there has been an infringement of that right." Gulf Coast Bank, 652 So.2d at 1309. To establish a protectable right, the actual use of a name, or, in other words, priority of appropriation, is required to give rise to a proprietary interest in the name. Gulf Coast Bank, 652 So.2d at 1313. In this case, it is clear that the appellant has used the name "Inka's S'COOLWEAR" since January of 1996, in addition, the appellant's trade name has been registered with the Secretary of State since October of 1995.
However, use alone is insufficient to create a protectable proprietary interest. Gulf Coast Bank, 652 So.2d at 1313. In addition to use of a trade name, the name itself must be distinctive. In Gulf Coast, the court held that there are two methods by which a name may be deemed distinctive. First, it can be inherently distinctive from its inception and initial use, or second, it can become distinctive over a period of time by acquiring a secondary meaning. Distinctiveness serves two purposes with respect to trade names. On one hand, distinctiveness allows a user the right to appropriate the trade name for his use, and on the other hand, it gives the user the right to prevent others from using that trade name in a manner that is likely to confuse the public. Gulf Coast Bank, 652 So.2d at 1313.
There are four categories used by the Louisiana courts and the federal courts to determine whether a trade name is distinctive. The categories are: 1) generic, 2) descriptive, 3) suggestive, and 4) arbitrary or fanciful. Gulf Coast Bank, 652 So.2d at 1313.
Over the years, the courts have fashioned illustrations for each of these categories. A generic term is derived from a particular genus or class of which an individual article or service is a member such as "aspirin." Merit Industrial Constructors, Inc. v. JE Merit Constructors, Inc., 563 So.2d 1008, 1011 (La.App. 1 Cir.1990) (citing Zatarains Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 790 (5th Cir.1983). Generic terms are considered public domain and can never be protected as trade names. Gulf Coast Bank, 652 So.2d at 1313. A descriptive term is used to identify a characteristic or quality of an article or service such as "vision center," which depicts a clinic that provides optical goods and services. Merit Industrial Constructors, Inc., 563 So.2d at 1011 (citing Vision Center v. Opticks Inc., 596 F.2d 111, 115 (5th Cir.1979), cert. denied, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980)). Descriptive terms are generally not protected, but these terms may acquire distinctiveness over a period of time through a secondary meaning thereby receiving protection as a trade name. Gulf Coast Bank, 652 So.2d at 1314. A suggestive term merely suggests and requires imagination on the part of the consumer in order to understand the name as descriptive, as in the name "Coppertone" requiring the imagination on the part of the consumer to link the name to *501 sun tanning products. Merit Industrial Constructors, Inc., 563 So.2d at 1011 (citing Vision Center, 596 F.2d at 115-116). An arbitrary or fanciful term does not bear a relationship to the product or service to which it applies, such as "Kodak" with respect to photographic supplies. Merit Industrial Constructors, Inc., 563 So.2d at 1011 (citing Vision Center, 596 F.2d at 117). Both suggestive and arbitrary or fanciful terms are by their nature inherently distinctive; therefore, they require no secondary meaning. Gulf Coast Bank, 652 So.2d at 1314.
The question in this case is whether the name "S'COOLWEAR" could be defined as suggestive as opposed to descriptive as the name implies. Although not clearly spelled out in the trial court's oral reasons for judgment, it can be inferred that the trial court determined that the name "S'COOLWEAR" standing alone was a descriptive term, thereby requiring a secondary meaning.
Using descriptive names such as "formal wear" or "swim wear," a consumer could reasonably infer the producer's type of business or field. Here, the term "S'COOLWEAR" is neither suggestive, arbitrary or fanciful, because a consumer upon hearing the name could reasonably infer, without imagination, the type of business in which the appellant was engaged in, i.e. school products or school clothing ("S'COOLWEAR").
Regarding descriptive terms, a trade name may acquire a secondary meaning and become distinctive over a period of time. This means the name "S'COOLWEAR" when used alone would make the consuming public think of the producer, "Inka's S'COOLWEAR" based on its duration of use within the community. In this case, at the earliest, the appellant used the name "Inka's S'COOLWEAR" in solicitation for business in September of 1995. Further, Mrs. Mims states in the record that she did not launch her primary advertisement campaign until January of 1996, and she did not open her business until June of 1996. The suit for injunction in this case was filed in July of 1996, only a month after the appellant was officially opened for business. This court is not of the belief that based on a secondary meaning, a distinctive trade name could be formed over such a short period of time.
We agree with the finding of the lower court, the name "S'COOLWEAR" as it is used by the appellant is not distinctive. Existence of a secondary meaning presents a question for a trier of fact, and a district court's finding on the issue will not be disturbed unless that finding is deemed clearly erroneous. Zatarains, Inc., 698 F.2d at 793. Sufficient evidence exists to support the trial court's holding that "S'COOLWEAR" is a descriptive term that requires a secondary meaning.

B. Unfair Trade Practice
Louisiana Revised Statutes 51:1405(A) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." A practice is considered unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers, and consumers include business competitors. Roustabouts, Inc. v. Hamer, 447 So.2d 543, 548 (La.App. 1st Cir.1984). Louisiana Revised Statutes 51:1409 confers a private right of action on "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal," from unfair trade practices. However, the unfair trade practices law does not prohibit sound business practices, the exercise of permissible business judgment or appropriate free enterprise transactions. United Group of National Paper Distributors, Inc. v. Vinson, 27,739 (La.App.2d Cir.1/25/96), 666 So.2d 1338, 1345-46, writ denied, 96-0714 (La.9/27/96), 679 So.2d 1358.
In the instant case, the trial court found that School Time, L.L.C. was simply enforcing its contractual rights with Kehoe-France. The trial court stated, "[t]he fact that they [School Time, L.L.C.] wished to enforce what might be a valid contract, is not to be classified as the bad people. If you have a contract, people are supposed to live up to the terms. Enforcing your rights under *502 a contract should not be looked upon as doing something wrong."
The appellant argues that School Time, L.L.C.'s enforcement of its contract was unfair trade practice. We do not agree. Protecting one's rights under a contract is not an offense to any public policy and is not unethical or oppressive such as to be an unfair trade practice.
Further, appellant also argues that appellee conducted unfair trade practices in regards to Industrial Garment Manufacturing ("IGM"), by using its influence with IGM to force IGM to "string along" the appellant so that it would be too late for appellant to get any uniforms manufactured. There is nothing in the trial record to support this accusation. There is no evidence that appellee undertook any actions other that entering into an agreement whereby IGM was to produce its uniforms. This action does not amount to an unfair trade practice. It was simply sound business practice. Therefore, after a thorough review of the entire record in this matter, we find the trial court did not err in finding that there was no violation of the unfair trade practices law.

C. Tortious Interference with Contract
In 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989), the Louisiana Supreme Court recognized the possibility of a narrowly drawn action for intentional interference with contractual rights and indicated that it would proceed with caution in expanding that cause of action. Great Southwest Fire Insurance Company v. CNA Insurance Companies, 557 So.2d 966 (La.1990). In Spurney, the court addressed the plaintiff's contractual interference claims as follows:
It is the basic policy of our law that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La. C.C. art. 2315. The framers conceived of fault as a breach of a preexisting obligation for which the law orders reparation, when it causes damage to another, and they left it to the courts to determine in each case the existence of an anterior obligation which would make an act constitute fault. 2 M. Planiol, Treatise on the Civil Law, Part 1, Secs. 863-865 (1959); Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La.1988). Referring to these basic principles, we conclude that, in light of modern empirical considerations and the objectives of delictual law, an officer of a corporation owes an obligation to a third person having a contractual relationship with the corporation to refrain from acts intentionally causing the company to breach the contract or to make performance more burdensome, difficult or impossible or of less value to the one entitled to performance, unless the officer has reasonable justification for his conduct.
Gulf South Business Systems and Consultants, Inc. v. Dept. of Environmental Quality, 625 So.2d 697, 701 (La.App. 1 Cir.1993), (citing Spurney, 538 So.2d at 231). The court specifically limited its foray into the common law doctrine of interference with contract, stating:
It is not our intention, however, to adopt whole and undigested the fully expanded common law doctrine of interference with contract, consisting of "a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way."
Spurney, 538 So.2d at 234.
Instead, the court recognized "only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." Spurney, 538 So.2d at 234. Furthermore, the court specifically repudiated recovery based upon negligent interference with contract. The court noted:
Interference with [a] contract, which had its modern inception in malice has remained almost entirely an intentional tort; and, in general, liability has not been extended to the various forms of negligence by which performance of a contract may be prevented or rendered more burdensome.
Spurney, 538 So.2d at 232.
The Louisiana Supreme Court went on to set out five (5) elements that a plaintiff must *503 prove when alleging intentional and unjustified interference with contractual relations:
(1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.
Spurney, 538 So.2d at 234.
In the instant case, the trial court noted that the existence of any contract between "Inka's S'COOLWEAR" and Kehoe-France was questionable because of the prior written contract between School Time L.L.C. and Kehoe-France. Even if appellant did have an oral agreement with Kehoe-France, appellee, School Time L.L.C., did not act to breach that agreement or to render its performance impossible or more burdensome, rather they were simply enforcing its previously existing contract with Kehoe-France.
Appellant also alleges tortious interference with contract, by appellee, regarding her company's business dealings with IGM. This assignment of error is meritless, because appellant failed to show that a contract between "Inka's S'COOLWEAR" and IGM existed. In its oral reasons for judgment, the trial court stated:
With regards to I.G. Manufacturers, it's alleged unfair trade practice, interference with the contract. First of all, interference with the contract by School Time with Inka's S'COOLWEAR with regards to I.G.M. was to no avail because there has not been proof of any contract. A contract involves more than will you work for me on these uniforms, patterns, the quantity, the price; none of this was resolved.
Appellant fails to prove the first element of an intentional interference with contract claim. Therefore, as to Kehoe-France and IGM, we find no error in the trial court's decision.

D. Damages
Because we agree with the trial court that the appellant did not meet its burden of proof in its claims of unfair trade practice and tortious interference of contract, we pretermit a discussion of the issue of damages.

CONCLUSION
For the foregoing reasons, the judgment of the trial court, dismissing plaintiff/appellant's claim for injunctive relief and damages, is affirmed. All costs of this appeal are assessed against the appellant.
AFFIRMED.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] This was approximately one month before Mrs. Mims registered the trade name.