ALLIED NORTH AMERICAN CORPORATION OF TEXAS
v.
RICHARD EDGECOMB, ICT GROUP, L.L.C., MARSH USA, INC. AND STATE OF LOUISIANA.
No. 2009 CA 0113.
Court of Appeals of Louisiana, First Circuit.
June 19, 2009.
Not Designated for Publication
ROBERT J. BURNS, JR., JOHN W. PERRY, JR., Baton Rouge, LA, Attorneys for Plaintiff-Appellant, Allied North American Corp. of Texas.
WILLIAM F. GRACE, JR., CHARLES D. MARSHALL, III, New Orleans, LA, Attorneys for Defendants-Appellees, Richard Edgecomb and Marsh USA, Inc. (Texas).
LAUREN S. COENEN, JUDE C. BURSAVICH, SCOTT N. HENSGENS, Baton Rouge, LA, Attorneys for Defendant-Appellee, ICT Group, L.L.C.
Before: PARRO, McCLENDON, and WELCH, JJ.
WELCH, J.
Plaintiff, Allied North American Corporation of Texas (Allied), appeals a summary judgment dismissing a breach of contract claim against defendant, Richard Edgecomb, and a judgment rendered after a trial on the merits dismissing claims for intentional breach of contract and unfair trade practices against defendants Richard Edgecomb and Marsh USA, Inc. (Texas) (Marsh). Richard Edgecomb answered the appeal to challenge the dismissal of his reconventional demand seeking attorney fees and costs. We affirm.

BACKGROUND
On June 29, 2001, Allied filed this petition for breach of contract, damages, and a declaratory judgment against Richard Edgecomb, Marsh, ICT Group, L.L.C. (ICT), and the State of Louisiana. Allied hired Mr. Edgecomb on October 28, 1998, as an insurance broker, and entered into an employment agreement with him on November 13, 1998. While in Allied's employ, Mr. Edgecomb actively pursued a contract with the State of Louisiana to procure excess property coverage that was subject to the public bid process. The bid specifications, FEC-13, provided for the placement of insurance for the policy year July 1, 1999, through July 1, 2000, with two one-year options to renew the coverage placed.
Mr. Edgecomb worked in conjunction with ICT to submit a bid to the State. On March 30, 1999, the State issued a notice of award of the contract to ICT, also listing Allied and Mr. Edgecomb on the notice of the award. It is undisputed that for the first policy period, July 1, 1999, through July 1, 2000, Allied and ICT had an agreement to share brokerage fees, and fees were paid in accordance with that agreement, with Allied, ICT, and another broker each receiving $100,000.00.
On May 19, 2000, more than one month before the expiration of the insurance policy, Mr. Edgecomb left his employment with Allied and went to work for Marsh, a competitor brokerage firm. It is also undisputed that Marsh, not Allied, received brokerage fees for the July 1, 2000-July 1, 2001 renewal of the State's insurance policy, with Marsh, ICT, and another brokerage firm each receiving $100,000.00. For the July 1, 2001-July 1, 2002 policy period, the State re-bid the contract and Marsh again received brokerage commissions from the award of the re-bid contract.
In its petition, Allied alleged that the brokerage fees received by Marsh for the July 1, 2000-July 1, 2001 renewal and the July 1, 2001-July 1, 2002 insurance contract rightfully belonged to it. Allied asserted that Mr. Edgecomb breached his employment contract by failing to act as a fiduciary and misappropriated or discarded Allied's property. Allied claimed that when Marsh hired Mr. Edgecomb, Marsh was aware of Mr. Edgecomb's employment agreement with Allied, was aware that the contract of insurance had been awarded to Allied, and knew of the partnering agreement Allied had entered into with ICT regarding the distribution of brokerage commissions. Allied asserted that, despite the knowledge of the contractual interest Allied enjoyed with both the State and ICT, Mr. Edgecomb and Marsh intentionally caused one or more of the parties to the contract, ICT and/or the State, to cease performing, causing Allied damages. Allied further alleged that the actions of Mr. Edgecomb, Marsh, and ICT constituted intentional interference with its contract, as well as unfair and deceptive trade practices within the contemplation of La. R.S. 51:1401, et seq., and that Marsh was liable for Mr. Edgecomb's actions under the theory of respondeat superior. It sought to recover the loss of brokerage fees it would have received during the 2000-2001 and 2001-2002 insurance policy periods, liquidated damages as provided in Allied's contract with Mr. Edgecomb, and damages for loss of business reputation and lost business opportunity as a result of Mr. Edgecomb's alleged bad faith breach of his contractual obligations.
Prior to trial, Allied dismissed the State and ICT from the litigation. Marsh and Mr. Edgecomb then filed a motion for summary judgment seeking dismissal of all claims that Mr. Edgecomb breached his employment contract and that Marsh interfered with that employment agreement. Defendants urged that the non-competition clause contained in Mr. Edgecomb's employment contract with Allied violated Louisiana law and was therefore unenforceable. They further charged that even if the non-competition agreement was enforceable, there was no positive evidence that Mr. Edgecomb breached any provision of the employment contract, solicited the State's business, took any action to have the State discontinue or refrain from entering into a relationship with Allied, or misappropriated and/or discarded Allied's property.
In support of the motion for summary judgment on the breach of contract issue, defendants relied on Mr. Edgecomb's affidavit and deposition, and excerpts of the deposition testimony of Mr. Lloyd Ray Pitts, Jr., Allied's president and designated representative. In his affidavit, Mr. Edgecomb attested that he never solicited business from the State after his May 19, 2000 resignation from Allied and insisted he did not remove, discard, or destroy any of Allied's property. Specifically, Mr. Edgecomb stated that after he resigned from Allied, he was contacted indirectly by the State, through a representative of ICT, to assist the State in its efforts to renew the policy of insurance that was originally placed in July of 1999. Mr. Edgecomb attested that prior to his resignation from Allied, he did not solicit the State for the renewal of insurance and did not encourage the State to discontinue or refrain from entering into any relationship with Allied. In his deposition, Mr. Edgecomb explained that after he left Allied, ICT wanted him to help them solve a problem that had arisen when Liberty Mutual, the insurer on the initial policy, wanted to change the pricing as the 2000 renewal approached. He stated that after he began working for Marsh, he was told that the State specifically requested his help in resolving the issues raised by Liberty Mutual in connection with the renewal policy.
In his deposition, Mr. Pitts admitted that to his knowledge, no one at Allied had seen Mr. Edgecomb destroy or remove any documents when he left Allied's employ. Mr. Pitts stated that Allied suspected documents had been destroyed because in the normal course of business, the company would have expected to find certain things in the file or in e-mails that were not there after discovery was conducted. When asked whether he had any information that Mr. Edgecomb solicited any business before he left Allied's employ, Mr. Pitts acknowledged he did not know whether Mr. Edgecomb talked to either ICT or the State about moving that business. He admitted that Allied had no information that Mr. Edgecomb did anything before leaving Allied's employ that violated the employment agreement. Mr. Pitts stated that he believed Mr. Edgecomb initiated contact with the State and solicited the State's business after he left Allied's employ. As evidence of the solicitation, Mr. Pitts cited telephone records and the fact that Marsh ended up with the State's business.
Defendants argued that Allied failed to produce any evidence to show that Mr. Edgecomb solicited the State's business or took any action to have the State discontinue its relationship with Allied. Instead, they urged, Allied's breach of contract claim was based on Mr. Pitts' speculative belief, supported only by telephone records that had not been identified or produced, and the fact that Marsh ended up with the State's business. Defendants argued that particularly in view of Mr. Edgecomb's deposition testimony and the declarations in his affidavit that he did not solicit business from the State and was asked to help the State solve a problem with the renewal after he left Allied's employ, Allied lacked evidentiary support for its breach of contract claim.
In opposition to the motion for summary judgment, Allied submitted an employment agreement signed by Mr. Edgecomb, Proposal No. FEC-13 and notice of the award of the contract, Mr. Edgecomb's depositions, and various emails, letters, and facsimile transmissions to and from Mr. Edgecomb and others involved in the State's insurance account. Allied urged that it could demonstrate Mr. Edgecomb violated two provisions of the employment agreement, Paragraph 7, which imposes fiduciary obligations on Allied employees regarding confidential information, and Paragraph 8, which precludes an employee from soliciting any client or person who has a relationship with Allied to discontinue, terminate, cancel, or refrain from entering into any relationship with Allied, during the employment or for a two-year period following the employment. Paragraph 7 of the employment agreement provides as follows:
Confidential Information. Employee will hold in a fiduciary capacity for the benefit of the Company and its affiliates all information, knowledge and data relating to or concerned with their operations, sales, business and affairs (except such information as is generally known in the industry), and he/she will not, at any time hereafter, disclose or divulge any such information, knowledge or data to any person, firm or corporation other than to the Company or its designees or except as may otherwise be required in connection with the business and affairs of the Company and its affiliates.
Paragraph 8 of the employment agreement provides, in pertinent part:
Restrictive Covenants. During the term of this agreement, Employee shall render his/her services exclusively to the Company and/or its affiliates and he/she shall not, directly or indirectly, perform services as an employee for, own, manage, operate, join, control, participate in, invest in (except as permitted in Paragraph I above) or otherwise be connected with in any manner any entity which is engaged in the business of insurance brokerage... in which the Company or its affiliates is currently engaged or may hereafter be engaged at any time during the term thereof. In addition, Employee shall not, during the term of his/her employment by the Company and for a period of two (2) years thereafter, for him/herself or on behalf of any other person, partnership, corporation or entity, directly or indirectly, or by action or in concert with others ... (b) solicit, induce or encourage any client, customer or other person who has a relationship with the Company to discontinue, terminate, cancel or refrain from entering into any relationship with the Company or any of its affiliates.
Allied urged that while the bulk of defendants' argument was directed to the validity of that portion of Paragraph 8, which prohibited employees from soliciting business during a two-year period following the termination of the employment, the actions of which Allied complained occurred prior to termination of the employment, while Mr. Edgecomb still owed fiduciary duties to Allied. It also argued that even in the absence of a written agreement, Mr. Edgecomb owed a duty of nonsolicitation both before and after the termination under the law.
The evidence submitted by Allied reflects that through Proposal No. FE13, the State accepted bids for excess property coverage on various Louisiana properties for the period of July 1, 1999, through July 1, 2000, with two oneyear options to renew. Mr. Edgecomb, while in Allied's employ, and ICT, a Louisiana insurance agency, worked on the bid submission. Mr. Edgecomb stated that his work on the bid involved negotiating with insurance companies to provide the ultimate quote and coverages, and that he, along with ICT representatives Ken Thomas and Aubrey Temple, a London broker, and representatives of Liberty Mutual, worked as a team in preparing the actual response to the bid request. The notice of the award of the bid, signed by State Risk Director Seth E. Keener, Jr., on May 30, 1999, lists ICT and its chairman under the heading, "insurance agency name." To the right of that listing appears the names Allied and Richard Edgecomb, who signed for Allied as its vice president.
Following the award of the insurance contract to Liberty Mutual, Allied invoiced the State for $3,211,500.00, and a policy was issued by Liberty Mutual. Allied received $100,000.00 in brokerage fees, with equal amounts paid to ICT and a London brokering underwriter. At some point, there were questions regarding the renewal because Liberty Mutual wanted to raise the premium, but it had not provided notice to the State within the window of time provided for in the bid specifications. Mr. Edgecomb stated that he knew of the problems with the renewal while he was interviewing with Marsh, but when he left Allied's employ, he thought the problem had been solved. Mr. Edgecomb testified that after leaving Allied's employ, he was approached by ICT to assist ICT and the State in obtaining the renewal of the Liberty Mutual policy for the July 1, 2000-July 1, 2001 policy term. Ultimately, the problem was resolved while Mr. Edgecomb was working for Marsh, and Marsh initially invoiced the State for the insurance premium; that invoice was voided, ICT issued an invoice, and the State paid that invoice. Marsh received a share of the commission in the amount of $100,000.00, and ICT and another agency each received $100,000.00 in brokerage fees.
In opposition to the motion for summary judgment, Allied insisted that its evidence demonstrated that Mr. Edgecomb solicited the State's business from Allied while still in its employ in violation of his contractual and general fiduciary duties. It urged that various writings demonstrated that Mr. Edgecomb was lining up the transfer of the State's account to Marsh while he remained employed at Allied. Allied argued that although Mr. Edgecomb gave notice to Allied on May 19, 2000, that he was leaving its employ, Mr. Edgecomb's employment continued ten days thereafter, until May 29, 2000, by virtue of a notice provision in the contract. However, Allied's own evidence refuted this claim. Various e-mails exchanged between Mr. Edgecomb and Mr. Pitts and Mr. Pitts and Allied employees show that on May 19, 2000, Mr. Edgecomb notified Allied that he was resigning his position to accept a management position with Marsh. That same day, Mr. Pitts sent an e-mail to an Allied employee asking that appropriate steps be taken to remove Mr. Edgecomb from the system and to transfer Mr. Edgecomb's e-mails and personal computer drive to Mr. Pitts. Mr. Pitts also noted that the contract called for ten days notice to terminate; however, he stated that it was agreed that Mr. Edgecomb would leave that day, and it would be his last day.
None of the documentary evidence submitted by Allied in opposition to the motion for summary judgment detailed any conversations or actions by Mr. Edgecomb prior to May 19, 2000, the date on which he left Allied's employ. Instead, all of the documentary evidence reflects activities and conversations after that date. In opposition to the motion for summary judgment, Allied principally relied on two documentary items as proof that Mr. Edgecomb was lining up the transfer of the State's account to Marsh while still in its employ. The first is an unsigned, unauthenticated notation dated May 24, 2000, referring to Mr. Edgecomb, and containing the following notations: "talked to Seth Keener," and "Seth & he believes ICT lead on property policy & can change broker (Richard) at will." Two other notations on this document describe letters to be written by ICT to effectuate Mr. Edgecomb's appointment as ICT's broker.[1] The second is a June 9, 2000 e-mail from Mr. Edgecomb to Mr. Thomas of ICT on the subject of "State of Louisiana broker relationships," which noted that "to make the placements work there is a need for varied players in varied roles." Mr. Edgecomb continued: "These were explained to Marsh prior to my joining the firm and have been accepted by Marsh management." Allied insisted this document proved that Mr. Edgecomb engaged in discussions with Marsh regarding the State's account prior to his joining Marsh in violation of his agreement to refrain from doing so.
Defendants argued that the handwritten note was inadmissible because it had not been authenticated, and urged that even if this evidence was properly before the court, it did not show any conversations between Mr. Edgecomb and the State, but in fact corroborated Mr. Edgecomb's testimony that he was approached by the State and ICT. Additionally, defendants argued that even if the May 24, 2000 note suggested a solicitation occurred on that date, it is clear that the purported solicitation occurred after Mr. Edgecomb left Allied's employ on May 19, 2000, and therefore could not support a claim for breach of the employment agreement prior to his termination. They also urged that Mr. Edgecomb's June 9, 2000 e-mail did not support the breach of contract claim because when presented with this document during his deposition, Mr. Edgecomb admitted that he mentioned his work on the State's insurance account to demonstrate he had technical abilities required for the management position he was seeking at Marsh. None of this evidence, defendants insisted, contradicted Mr. Edgecomb's sworn affidavit and deposition testimony that he did not solicit the State's insurance business from Allied on behalf of Marsh.
The trial court agreed, concluding that there was absolutely no evidence that would indicate Mr. Edgecomb did anything before or after leaving Allied's employ that constituted a breach of his employment contract. In the absence of such, the court stated, Allied did not satisfy its burden of coming forward with evidence showing its likelihood of proving at trial that Mr. Edgecomb breached the employment contract, and therefore, entered summary judgment dismissing the breach of contract claims.
Allied's remaining claims for intentional interference with contract and unfair trade practices against Mr. Edgecomb and Marsh proceeded to trial. Following the conclusion of the trial, the court made a factual determination that Allied failed to meet its burden of proving that there was an agreement between Allied and ICT to split brokerage fees beyond the first policy period. The court observed that while Allied received the agreed-upon fee for the first year, there was no evidence that it had any type of contract for a fee for the second year of the policy. The court found that the facts did not support a claim for intentional interference with a contract and that Allied failed to prove any conduct on defendants' part constituting an unfair trade practice. The court also granted a peremptory exception raising the objection of prescription on the unfair trade practices claim that had been filed earlier in the litigation by defendants, but had been referred to the merits.
Allied appealed the summary judgment dismissing its breach of contract claim and the judgment dismissing its remaining claims against Mr. Edgecomb and Marsh. Mr. Edgecomb answered the appeal, challenging the trial court's dismissal of his reconventional demand for attorney fees and costs, in which he asserted that Allied's claims for unfair trade practices were groundless and brought in bad faith for the purpose of harassment.

SUMMARY JUDMGENT
This court reviews a trial court's decision to grant or deny a motion for summary judgment de novo, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. Boudreaux v. Vankerkhove, 2007-2555, p. 5 (La. App. 1st Cir. 8/11/08), 993 So.2d 725, 729-730. The motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
On a motion for summary judgment, the initial burden of proof is on the moving party. However, on issues for which the moving party will not bear the burden of proof at trial, the moving party must only point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense. Thereafter, the nonmoving party must produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial; if the nonmoving party fails to do so, there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2); see Boudreaux, 2007-2555 at p. 5, 993 So.2d at 730.
Allied contends that it proved, by direct and circumstantial evidence, that Mr. Edgecomb schemed with Marsh before he left Allied's employ to take the State's business and to deprive Allied of revenue generated by its work for the State in violation of Mr. Edgecomb's contractual and general fiduciary duties toward Allied. Allied no longer relies on the May 24, 2000 unsigned, unauthenticated notation to support its claim. It relies principally on the June 9, 2000 e-mail from Mr. Edgecomb to ICT referencing State of Louisiana broker relationships in which Mr. Edgecomb stated that the roles in the insurance placement were explained to Marsh prior to his joining the firm and had been accepted by Marsh management. Allied insists that this e-mail constitutes direct evidence that Mr. Edgecomb schemed with Marsh to take the State's business before he left Allied's employment. As evidence of the alleged scheme, Allied also relies on the facts that Marsh issued an invoice to the State for the insurance premium for the second policy period which was voided and later reissued by ICT, that Marsh received $100,000.00 in fees generated by the State's renewal of the insurance policy, and that Mr. Edgecomb was promoted shortly after his employment with Marsh began.[2]
In this case, defendants pointed out the absence of factual proof for Allied's breach of contract claim. Allied's president admitted he did not have knowledge that Mr. Edgecomb spoke with anyone from ICT or the State about moving the State's business. He also admitted he did not receive information of efforts on Mr. Edgecomb's part to solicit the State's business prior to leaving Allied's employ. Mr. Edgecomb denied having solicited the State's business either before or after he left Allied's employ. Instead, Mr. Edgecomb stated that after he left Allied's employ, he was contacted by the State indirectly through an ICT representative to assist the State in its efforts to renew the policy of insurance. In light of this evidence, it became incumbent on Allied, which bore the burden of proving at trial that Mr. Edgecomb breached his contractual or fiduciary duty to Allied, to come forward with factual support sufficient to show that it could satisfy its evidentiary burden at trial. Allied clearly failed to do so. It offered no testimonial evidence to show that Mr. Edgecomb engaged in any scheme or plan with Marsh to deprive Allied of brokerage commissions while he was still in Allied's employ. Because Allied failed to offer sufficient factual support to establish that it would be able to satisfy its evidentiary burden of proof at trial, the trial court properly granted summary judgment on the breach of contract claim.

TORTIOUS INTERFERENCE WITH CONTRACT
Allied contends that the evidence adduced at trial demonstrated that Marsh and Mr. Edgecomb intentionally caused Allied's contract with ICT and the State to be breached, thus rendering defendants liable for tortious interference with contract. Allied also insists that because Mr. Edgecomb's actions directly benefitted Marsh and were known by Marsh before, during, and after his tortious conduct, Marsh is also liable for Allied's damages on a theory of respondeat superior. Allied claims it proved both theories of liability because its evidence demonstrated that: (1) before Mr. Edgecomb left Allied, he orchestrated a breach of the agreements Allied had in place with ICT and the State; (2) these agreements were breached with Marsh's assistance and knowledge; (3) the breach of the agreements was in violation of Marsh's stated policy of honoring non-compete agreements; and (4) Marsh billed for and accepted fees it knew were due to Allied.
The action for intentional interference with contractual rights is a very narrow one, with five elements a plaintiff must prove to recover: (1) the existence of a contract or legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or cause of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; and (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer. 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 234 (La. 1989).
The trial court found as a fact that based upon the testimony, Allied failed to prove the existence of a contract or agreement giving it a right to a share of brokerage fees in the second year. Specifically, the court found that while there was evidence of a fee-splitting agreement for the first year of the contract and Allied received the agreed-upon fee for that year, Allied failed to prove the existence of a contractual agreement for the splitting of fees or the right to receive fees beyond the first year of the contract. This factual determination is subject to the manifest error standard of review. Pursuant to that standard, for reversal, this court must find that a reasonable factual basis does not exist for the finding and that the finding was clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993). The trial court's factual finding that there was no contractual agreement for the splitting of brokerage fees beyond the first year of the insurance contract is reasonably supported by the record, and is not clearly wrong. As Allied failed to prove the existence of a contract for brokerage fees that could have been the subject of a tortious interference claim, the trial court correctly dismissed Allied's claims for damages under this legal theory.

UNFAIR TRADE PRACTICES
Allied also challenges the trial court's ruling that its claims for damages under the Louisiana Unfair Trade Practices and Consumer Protection Act, specifically La. R.S. 51:1409, had prescribed. In oral reasons for judgment, the trial court found that Allied failed to meet its burden of proving an unfair trade practice by a preponderance of the evidence. The trial court also found that Allied's unfair trade practices claim had prescribed.
Louisiana Revised Statutes 51:1405(A) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." A practice is considered unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers, and consumers include business competitors. Inka's Coolwear, Inc. v. School Time, L.L.C., 97-2271, p. 10 (La. App. 1st Cir. 11/6/98), 725 So.2d 496, 501. After a thorough review of the record, we find no error in the trial court's finding that Allied failed to prove a violation of the unfair trade practice law.[3]

RECONVENTIONAL DEMAND
Mr. Edgecomb answered the appeal to challenge the trial court's dismissal of his reconventional demand against Allied for attorney fees and costs pursuant to La. R.S. 51:1409(A). That provision authorizes the court to award attorney fees and costs to a defendant in a private action for damages for unfair trade practices upon finding that the action was groundless and brought in bad faith or for the purposes of harassment. This provision is penal in nature and subject to strict construction. A trial court has discretion in determining whether to award attorney fees under the statute. See Double-Eight Oil and Gas L.L.C. v. Caruthurs Producing Co., Inc., 41,451, p. 11 (La. App. 2nd Cir. 11/20/06), 942 So.2d 1279, 1286. Based upon the record before us, we find no abuse of the trial court's discretion in denying Mr. Edgecomb's demand for attorney fees.

CONCLUSION
For the foregoing reasons, the judgments appealed from are affirmed. All costs of this appeal, including the cost of supplementing the record, are assessed to appellant, Allied North American Corporation of Texas.
AFFIRMED.
McCLENDON, J., agrees in part and dissents in part.
I believe that summary judgment was improperly granted with respect to the breach of contract claim. Therefore, I respectfully dissent in part.
NOTES
[1] During Mr. Edgecomb's deposition, Allied's attorney stated that this document was produced by ICT during discovery and that the handwriting was probably that of ICT's representative, Ken Thomas.
[2] Allied also claims as evidence of the scheme the fact that "Edgecomb left Allied's employment at a time when the State's renewal of the 2000 policy was assured and, thus, Allied's fees fully earned," however, it offered no evidence to support the claim that when Mr. Edgecomb left its employ, the renewal was assured. Moreover, Allied did not offer evidence at the summary judgment stage demonstrating that it even had a contract for brokerage fees for the 2000-2001 policy period. Allied's unsupported allegations do not provide factual support for Allied's breach of contract or breach of fiduciary duties claims.
[3] We further find that the trial court correctly sustained the prescription objection as to the unfair trade practices claim, but as the record clearly supports the trial court's ruling on the merits of that claim, we pretermit further discussion of the prescription issue.