538 So.2d 228 (1989)
9 TO 5 FASHIONS, INC.
v.
Petr L. SPURNEY, et al.
Nos. 88-C-0902, 88-C-0904.
Supreme Court of Louisiana.
January 30, 1989.
*229 Eugene R. Preaus, Robert B. McNeal, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, Ernest L. O'Bannon, John E. McAuliffe, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, for Petr L. Spurney, et al.
Peter J. Castano, New Orleans, Wendell H. Gauthier, Metairie, for 9 to 5 Fashions, Inc.
DENNIS, Justice.
In this case we are called upon to decide whether an officer of a corporation owes any duty to a person having a contract with the corporation to refrain from unjustified, intentional interference with the contractual relationship. After a bench trial, the district court found that a corporate officer negligently and intentionally interfered with the plaintiff's performance of its contract with the corporation to supply uniforms and awarded damages against the officer. On appeal, the court of appeal reduced the damage award but otherwise affirmed. We reverse. We recognize a duty on the part of a corporate officer to refrain from the intentional interference with contractual relations between his corporation and other persons, unless there is a reasonable justification for his conduct. However, in the present case the corporate officer's actions were justified and therefore privileged because they were committed in the scope of his corporate authority, were not intended to interfere with the *230 performance of the contract and were not knowingly contrary to the corporation's best interest.

Facts
Louisiana World Exposition, Inc., (LWE), a non-profit corporation organized to plan and conduct the 1984 Louisiana World's Fair, contracted with 9 to 5 Fashions, Inc., to supply custom made uniforms for the Fair employees. After the Fair was over, 9 to 5 was unable to collect what it contends was the full amount owed under the contract because LWE had taken bankruptcy. Consequently, 9 to 5 filed suit against Petr Spurney, chief executive officer of LWE, and his insurer, alleging that Spurney damaged 9 to 5 by numerous acts and omissions of intentional and negligent interference that caused its performance of the uniform supply contract to be more burdensome and costly.
In 1983, prior to the Fair, LWE interviewed several prospective uniform suppliers and narrowed the field to two firms, 9 to 5 and Creative Images/Marlin Manufacturing Co. (Marlin). The task of studying the two firms' qualifications and making a recommendation to LWE's Management Committee for a final selection was referred to the Concessions Committee. In September, 1983, Spurney, as chief executive officer, advised the Concessions Committee to recommend Marlin. 9 to 5 filed suit against Marlin and an LWE employee alleging restraint of trade. Spurney induced 9 to 5 to dismiss the suit by agreeing to recommend 9 to 5 for the uniform contract. Some three weeks after this agreement, on November 16, 1983, Spurney recommended to the Management Committee that 9 to 5 be awarded the contract. On the same day, the Management Committee approved 9 to 5 as uniform supplier and referred the matter to the LWE legal department for final negotiations and formal contract preparation. During the interim between Spurney's agreement and his recommendation to the Management Committee, Spurney directed LWE employees to communicate with other uniform supply firms to determine if any could provide the uniforms for the Fair, in the event no formal contract with 9 to 5 was completed. Beginning in December, 1983, 9 to 5 ordered fabric as best it could with the advice and approval of LWE employees who were not specifically assigned to perform this function. Spurney did not appoint an LWE employee to be exclusively in charge of coordinating the design and supply of the uniforms until February 7, 1984. Spurney appointed an LWE employee who had experience with costuming and wardrobing, but no experience with uniform supply coordination, instead of another employee who had performed this function for a previous world's fair. The uniform contract was not signed until May 8, 1984, just a few days prior to the opening of the fair on May 12, 1984. See the court of appeal's opinion for a more complete statement of the facts, including a description of LWE's internal organization and operations. 9 to 5 Fashions, Inc. v. Spurney, 520 So.2d 1276 (La. App. 5th Cir.1988).

Trial and Appeals Courts
The trial court found that Spurney's delay in appointing a uniform coordinator hampered 9 to 5's ability to anticipate uniform needs and resulted in its ordering more material than was ultimately required. This resulted in a loss of profits on the uniform contract by 9 to 5. The trial court concluded that Spurney was personally liable for this loss, which it fixed at $101,438. The court's rationale for assigning liability was unclear. Its opinion seems to assert that Spurney contractually agreed to be personally responsible for such losses, that he negligently caused the damage, and that he should be responsible because he was guilty of intentional misconduct and misrepresentation causing the harm.
The court of appeal reduced the damage award to $45,308 but otherwise affirmed the trial court judgment. The court found that Spurney breached his duty of "due care" by his delay in appointing a uniform coordinator, although he knew there was a need for such a coordinator three months earlier. Because of the lack of a person with exclusive responsibility, the court concluded, lack of communication and understanding resulted in delays in designing *231 and manufacturing as well as overordering of fabrics and notions. Further, the court found that the trial court's finding that "Spurney was carrying out a personal vendetta against 9 to 5" was not clearly wrong. As in the trial court's reasons, the court of appeal's decision does not seem to be based clearly on any one legal rationale but appears to be loosely associated with several legal theories. 9 to 5 Fashions, Inc. v. Spurney, 520 So.2d 1276 (La.App. 5th Cir.1988).

Plaintiff's Arguments
In this court, plaintiff does not argue that Spurney is liable to it in contract or that he was guilty of fraud or misrepresentation causing damage. Furthermore, the evidence does not reasonably support the finding of facts essential to 9 to 5's recovery on any of these grounds.
9 to 5's principal contention is that Spurney's acts causing 9 to 5 to experience delay and difficulty in the performance of its contract with LWE resulted in damage to 9 to 5 for which Spurney is liable. 9 to 5 seems to argue that Spurney acted intentionally to delay and hamper its performance. On the other hand, 9 to 5 also appears to argue that Spurney is legally responsible even if he was only negligent in causing damage. In effect, without labeling the delict, 9 to 5 urges this court to recognize an action that it has refused to allow since 1902, viz., an action for tortious interference with a contractual relationship. We must reexamine the basic precepts of our delictual law in the light of modern conditions to determine whether reparation is due under either an intentional or negligent interference with contract theory.

Legal Precepts
It is the basic policy of our law that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La. Civ. Code art. 2315. The framers conceived of fault as a breach of a preexisting obligation for which the law orders reparation, when it causes damage to another, and they left it to the courts to determine in each case the existence of an anterior obligation which would make an act constitute fault. 2 M. Planiol, Treatise on the Civil Law, Part 1, §§ 863-865 (1959); Pitre v. Opelousas General Hosp., 530 So.2d 1151 (La.1988).
Referring to these basic principles, we conclude that, in the light of modern empirical considerations and the objectives of delictual law, an officer of a corporation owes an obligation to a third person having a contractual relationship with the corporation to refrain from acts intentionally causing the company to breach the contract or to make performance more burdensome, difficult or impossible or of less value to the one entitled to performance, unless the officer has reasonable justification for his conduct. The officer's action is justified, and he is entitled to a privilege of immunity, if he acted within the scope of his corporate authority and in the reasonable belief that his action was for the benefit of the corporation.
Thus, an officer is privileged to induce the corporation to violate a contractual relation, or make its performance more burdensome, provided that the officer does not exceed the scope of his authority or knowingly commit acts that are adverse to the interests of his corporation. Where officers knowingly and intentionally act against the best interest of the corporation or outside the scope of their authority, they can be held liable by the party whose contract right has been damaged.
These precepts are derived from the contemporary doctrine of interference with contractual relations existing in other jurisdictions. See, e.g., Chanay v. Chittenden, 115 Ariz. 32, 563 P.2d 287 (1977); Wampler v. Palmerton, 250 Or. 65, 439 P.2d 601 (1968); Seven D. Enterprises Ltd. v. Fonzi, 438 F.Supp. 161 (E.D.Mich.1977). See generally, 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 1001(1986); W. Prosser and P. Keeton, The Law of Torts § 129 (5th ed. 1984); 2 Harper, James & Gray, The Law of Torts, § 6.5 et seq. (1986). See Perlman, Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine, 49 U.Chi.L.Rev. 61, 119 (1982); Avins, *232 Liability for Inducing a Corporation to Breach its Contract, 43 Cornell L.Q. 55 (1957); Carpenter, Interference with Contract Relations, 41 Harv.L.Rev. 728 (1927-28); Note, 89 Pa.L.Rev. 250 (1940). See also, Restatement of Torts, Second. § 766 et seq. (1979). Nevertheless, as general rules of action, they are consistent with civilian delictual principles and implemental of present day moral, social and economic values.
Interference with contract, which had its modern inception in malice has remained almost entirely an intentional tort; and, in general, liability has not been extended to the various forms of negligence by which performance of a contract may be prevented or rendered more burdensome. See W. Prosser & P. Keeton, The Law of Torts § 129 p. 997 (5th ed. 1984). In addition to the reasons given for the general policy against recovery based on negligence, Id. p. 1001, there are strong reasons that corporate officers should enjoy immunity from liability for negligent contractual interference as well as from liability for intentional interference committed within the scope of corporate authority for the corporation's benefit. Since officers owe fiduciary obligations to the corporation and its shareholders and hold policy making positions, their fidelity and freedom of action aimed toward corporate benefit should not be curtailed by undue fear of personal liability. See La.R.S. 12:226; Avins, supra, Perlman, supra. However, the officer's privilege should not be absolute, it should be limited by the purpose for which it is granted, i.e., to allow him to fully perform his fiduciary duty as authorized by his corporation. When the officer's action is detrimental to the corporation or outside the scope of his authority, the officer should be responsible for his intentional acts of interference with the contract rights of another. Avins, supra; cf. Glazer v. Com. on Ethics, 431 So.2d 752 (La.1983); 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 1001(1986).
In Louisiana, the case of Kline v. Eubanks, 109 La. 241, 33 So. 211 (1902) has been considered by many as establishing the proposition that no action will lie in this state for inducing breach of contract or interference with contractual relations by means which are not otherwise unlawful. In that case, the defendant induced a plantation laborer to leave his job in violation of his employment contract with the plaintiff. The petition did not allege that the defendant acted fraudulently or maliciously. This court affirmed a judgment sustaining defendant's exception of no cause of action and dismissing the plaintiff's actions as of nonsuit. The opinion of the court set forth a dual basis for its decision. First, the court cited cases and commentaries from common law jurisdictions stating that an action cannot be maintained for inducing a third person to break his contract unless malice, fraud or deception is alleged; viz., Boulier v. Macauley, 15 S.W. 60, 11 L.R.A. 550, 34 Am.St.Rep. 171 (Ky.); McCann v. Wolff, 28 Mo.App. 447 (1888); Kimball v. Harman, 34 Md. 401, 6 Am.Rep. 340 (1867); 1 Jag.Torts p. 636; Cooley, Torts (2d ed.) p. 581. Second, the court asserted that "[w]hen the general law was adopted (i.e., article 2315, Civ.Code), and for years afterward, the present system of labor was not known, and no necessity was felt for the new remedy." Kline v. Eubanks, 33 So. at 213.
The common law authorities relied upon in Kline v. Eubanks have been outflanked and rendered obsolete by modern economic developments. The position taken in those cases and commentaries has been abandoned by all Anglo-American jurisdictions and is contrary to the weight of opinion in other civil law jurisdictions. Louisiana is now the only American state that does not recognize the action for tortious interference with contractual relations. See 12 F. Stone, Louisiana Civil Law Treatise, Tort Doctrine § 263 (1977); Robertson, Recovery in Lousiana Tort Law for Intangible Economic Loss: Negligence Actions and the Tort of International Interference with Contractional Relations, 46 La.L.Rev. at 738; Stone, Tort Doctrine in Louisiana: From What Source Does It Derive? 16 Tul. L.Rev. 489, 512 (1942); Note, 30 *233 La.L.Rev. 713 (1970); Comment, 31 Loyola L.Rev. 327 (1988).
The expression of the Kline court that article 2315 must be limited to problems which were known to the drafters of the Code at the time the Code was drafted is obviously incorrect and must be disregarded as having been ill considered, particularly since the statement was uttered "[w]ithout especially passing upon this point." Kline v. Eubanks, 33 So. at 213. The basic concept of a civil code is that of a statement of general principles of law capable of governing the affairs of present and future generations. Portalis, the leading drafter of the Code Napoleon, clearly foresaw that the code must constantly be applied to unexpected issues and circumstances:
A code, however complete it may seem, is hardly finished before a thousand unexpected issues come to face the judge. For laws, once drafted, remain as they were written. Men, on the contrary, are never at rest; they are constantly active, and their unceasing activities, the effects of which are modified in many ways by circumstances, produce at each instant some new combination, some new fact, some new result.
A host of things is thus necessarily left to the province of custom, the discussion of learned men, and the decision of judges.
The role of legislation is to set, by taking a broad approach, the general propositions of the law, to establish principles which will be fertile in application, and not to get down to the details of questions which may arise in particular instances.
It is for the judge and the jurist, imbued with the general spirit of the laws, to direct their application. A. Levasseur, Code Napoleon or Code Portalis? 43 Tul. L.Rev. 762, 769 (1969) (Translation by Shael Herman)
See also, K. Zweigert and H. Puttfarken, Statutory Interpretation Civilian Style, 44 Tul.L.Rev. 704 (1970); A. Tate, Jr. Techniques of Judicial Interpretation in Louisiana, 22 La.L.Rev. 727 (1962); 1 Planiol, Treatise on the Civil Law, Nos. 224-225 (1959); R. Perrot, The Judge: The Extent and Limit of His Role in Civil Matters, 50 Tul.L.Rev. 495 (1976); A.N. Yiannopoulos, Louisiana Civil Law System Part I, pp. 91-93 (1977); Geny, Method of Interpretation and Sources of Private Positive Law (Trans.Louisiana Law Institute 1963); 12 F. Stone, Louisiana Civil Law Treatise, Tort Doctrine § 60 (1977); A. Tunc, Methodology of the Civil Law in France, 50 Tul.L. Rev. 459 (1976). Louisiana jurisprudence is replete with cases applying articles of the Code to problems that arose subsequently to the drafting of the Code. E.g., Butler v. Baber, 529 So.2d 374 (La.1988); Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (La.1971); Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207 (La.1922); Olsen v. Shell Oil Co., 365 So.2d 1285 (La.1978); Weber v. Fidelity and Casualty Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754 (La.1971); Hoefly v. Government Employees Ins. Co., 418 So.2d 575 (La.1982); Prudhomme v. Savant, 150 La. 256, 90 So. 640 (1922); Mooney v. American Automobile Ins. Co., 81 So.2d 625 (La.App. 1st Cir.1955); Sanders v. Hisaw, 94 So.2d 486 (La.App. 1st Cir. 1957) cert. denied.
Kline v. Eubanks and its progeny have been thoroughly and ably criticized by doctrinal commentators. Stone, Tort Doctrine in Louisiana: From What Sources Does it Derive?, 16 Tul.L.Rev. 489, 512 (1942); Stone, Tort Doctrine in Louisiana: The Materials for the Decision of a Case, 17 Tul.L. Rev. 159, 168 (1942); Malone, Torts, 25 La.L.Rev. 334, 341 (1965); Note, 17 Tul.L. Rev. 328, 331-32 (1942); Note, 30 La.L.Rev. 713 (1970); Robertson, Recovery, supra.
Moreover, a delictual rule such as Kline v. Eubanks that flatly and without good reason deprives an innocent person of any remedy for damage to his contract right caused intentionally and improperly by a corporate official is discordant with the fundamental civil law principle that obliges *234 a person to repair damage caused another by his fault. La.Civ.Code art. 2315. In truth, the Kline v. Eubanks bar is anachronistically unjust when compared with this court's application of the delictual principles to other issues and circumstances. E.g., PPG Industries, Inc. v. Bean Dredging, 447 So.2d 1058 (La.1984) (abrogating the rule that flatly prohibited recovery for intangible economic loss produced by negligent conduct); see also, Sanborn v. Oceanic Contractors, Inc., 448 So.2d 91 (La.1984) (suggesting that intentional tortious interference with contract rights may be actionable); Robertson, supra.
Accordingly, our courts' previous expressions barring absolutely any action based on a tortious interference with a contract are annulled insofar as they conflict with this opinion. E.g., Kline v. Eubanks, 109 La. 241, 33 So. 211 (1902); B.J. Wolf & Sons v. New Orleans Tailor-Made Pants Co., 113 La. 388, 37 So. 2 (1904); Moulin v. Monteleone, 165 La. 169, 115 So. 447 (1927); Hartman v. Greene, 193 La. 234, 190 So. 390 (1939); Cust v. Item Co., 200 La. 515, 8 So.2d 361 (1942); Templeton v. Interstate Electric Co., 214 La. 334, 37 So.2d 809 (1948); Moss v. Guarisco, 409 So.2d 323 (La.App. 1st Cir.1981); Eximco, Inc. v. Trane Co., 737 F.2d 505 (5th Cir. 1984). It is not our intention, however, to adopt whole and undigested the fully expanded common law doctrine of interference with contract, consisting of "a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way." W. Prosser & P. Keeton, The Law of Torts § 129, p. 979 (5th ed. 1984). Some aspects of this tort have been subjected to serious criticisms, leaving open a good many questions about the basis of liability and defense, the types of contract or relationship to be protected, and the kinds of interference that will be actionable. See W. Prosser & P. Keeton, Id.; Perlman, supra, Dobbs, Tortious Interference With Contractual Relationships, 34 Ark.L.Rev. 335 (1980). In the present case we recognize, as set forth particularly herein, only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person.

Application of Precepts
For purposes of analysis, the action against a corporate officer for intentional and unjustified interference with contractual relations may be divided into separate elements: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.
Applying the legal precepts, we conclude that, while plaintiff proved the contract's existence, Spurney's knowledge of the contract, and perhaps his negligence in delaying its performance, the evidence in this case does not present a reasonable basis for finding that Spurney intended to make 9 to 5's performance more difficult or costly, or that he acted outside the scope of his authority or in a manner he knew to be detrimental to his corporation's interest. Further, proof that Spurney's acts or omissions caused damage to 9 to 5 is debatable and may not be supported properly by the record, but it is not necessary that we deal with this issue because Spurney's conduct was not actionable.
The evidence reflects that Spurney's delay in appointing a uniform coordinator was not unusual or inconsistent with the procedure followed in administering the contracts of other suppliers. After the Management Committee selected a supplier *235 it was routine to refer that party to the legal department for final negotiations and the preparation of a formal contract. Usually a contract was finally confected and signed before it was assigned to a specific LWE division for administration. Spurney appointed a uniform coordinator for the 9 to 5 contract in February, 1984, three months before the contract was signed, because the uniforms were needed before the Fair was scheduled to open in May, 1984. There is no convincing evidence in the record that in 1983 and early 1984 the management of 9 to 5 interpreted Spurney's failure to appoint a coordinator sooner as being intended to harm its interests. There is no evidence that 9 to 5 ever requested such an appointment, or complained about the lack of one, in writing. A 9 to 5 employee testified that she tried to make phone calls to Spurney in October and November, 1983, but she admitted that she never talked to him about this subject. Although no one LWE official was specially designated as the exclusive uniform coordinator before February, 1984, the record indicates that several LWE employees voluntarily assisted and authorized 9 to 5 in the estimation, specification and purchase of fabrics beginning in December, 1983. Spurney testified that before LWE and 9 to 5 had signed a formal contract he asked an LWE employee to check on the availability of other uniform suppliers, as back-up suppliers, in the event a final contract with 9 to 5 was not completed. There is no evidence that Spurney initiated any contact with other suppliers after 9 to 5 was selected as the uniform contractor by the LWE Management Committee on November 16, 1983. Spurney and John Whitney, an LWE staff member, testified that the reason Whitney was not chosen as uniform manager, despite his prior experience, was that Whitney had formed a close relationship with Marlin Manufacturing, one of 9 to 5's competitors, when he worked with the Knoxville World's Fair. Considering all these circumstances, it might be argued that Spurney was negligent in not cutting through the normal bureaucratic procedures sooner to appoint the uniform coordinator. However, the evidence in this case does not support a realistic or rational finding that Spurney's acts or omissions were committed with the intention to interfere with the performance of the uniform contract or that Spurney acted outside the scope of his authority or acted knowingly contrary to the best interests of his corporation.
For the reasons assigned, the judgments of the court of appeal and the trial court are reversed at plaintiff's cost.
REVERSED.
MARCUS, J., concurs and assigns reasons.
WATSON, J., concurs in the result.
LEMMON, J., concurs.
MARCUS, Justice (concurring).
I agree that Petr L. Spurney, chief executive officer of LWE, should not be held personally liable to 9 to 5 Fashions, Inc. for any of his actions in connection with the contract between 9 to 5 Fashions, Inc. and LWE. His actions were within the scope of his corporate authority for the benefit of the corporation. Therefore, I would not reach much less abandon the prohibition against an action based on an intentional interference with a contract. Accordingly, I respectfully concur.