04-1483 consolidated with 04-1484, 04-1485, & 04-1486

WALTER A. GLOD, JR., M.D.

VERSUS

W. GREGORY BAKER, ET AL.

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 975864
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

**********
ULYSSES GENE THIBODEAUX
CHIEF JUDGE
**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and Marc T. Amy, Judges.

PETERS, J., DISSENTS AND ASSIGNS WRITTEN REASONS.

AMY, J., CONCURS AND ASSIGNS REASONS.

AFFIRMED.

Nancy Scott Degan
Roy C. Cheatwood
Jennifer B. McNamara
Kent Andrew Lambert
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
201 St. Charles Avenue - Suite 3600
New Orleans, LA 70170
Telephone:  (504) 565-5266
COUNSEL FOR:
    Defendants/Appellants - Nawlins Kajun Foods, L.L.C., NKF I-DR Limited
    Partnership, LAF Foods, Inc., BCM, L.L.C., Greg Baker Enterprises. CPCI
    Incorporated, Louis B. Viviano, CBC International, Inc., & V L B, Inc.

Steven Gerald Durio
Robert L. Broussard
Jessica Watts Farmer
Durio, McGoffin & Stagg
P. O. Box 51308
Lafayette, LA 70505-1305
Telephone:  (337) 233-0300
COUNSEL FOR:
    Defendants/Appellees - Donald J. Baker, Kirby Pecot, Andrew B. Jameson, Max
    Luttgeharm, & M. L. Godley, M.D.

Joseph C. Giglio, Jr.
Liskow & Lewis
P. O. Box 52008
Lafayette, LA 70505
Telephone: (337) 232-7424
COUNSEL FOR:
Plaintiff/Appellant - Walter A. Glod, Jr., M.D.

Robert A. Kutcher
Nicole S. Tygier
Patricia Diane Tunmer
Keegan E. Chopin
Chopin, Wagar, Richard, & Kutcher, LLP
Two Lakeway Center - Suite 900
3850 North Causeway Boulevard
Metairie, LA 70002
Telephone: (504) 830-3838
COUNSEL FOR:
Defendants/Appellees - Copeland's of New Orleans, Inc., the Succession of
William A. Copeland, III, and Alvin C. Copeland, Jr.

William H. Parker, III
Allen & Gooch
P. O. Drawer 3768
Lafayette, LA 70502-3768
Telephone: (337) 291-1270
COUNSEL FOR:
Defendants/Appellees - Darnall, Sikes, Kolder, Frederick & Rainey and Ed
Larry Sikes

Reginald J. Ringuet
Ringuet, Daniels & Collier
P. O. Box 52647
Lafayette, LA 70505
Telephone: (337) 232-0002
COUNSEL FOR:
Defendants/Appellants - CBC International, Inc., NKF I-DR Limited
Partnership, Nawlins Kajun Foods, L.L.C., CPCI Incorporated, Greg Baker
Enterprises, V L B, Inc., LAF Foods, Inc., BCM, L.L.C., and Louis B. Viviano

Larry Lane Roy
Jennifer A. Wells
Preis, Kraft & Roy
P. O. Drawer 94-C
Lafayette, LA 70509
Telephone: (337) 237-6062
COUNSEL FOR:
Defendants/Appellees - Coregis Insurance Company and Chris Verret

George Allen Walsh
Alice Estill
601 Napoleon Street
Baton Rouge, LA 70802
Telephone: (225) 381-9305
COUNSEL FOR:
Defendants/Appellees - W. Gregory Baker and Vikki Lynn Baiers

**John Bologna Krentel**
**601 North Carrollton Avenue**
**New Orleans, LA 70119-4747**
**Telephone: (504) 569-1800**
**COUNSEL FOR:**
  **Defendants/Appellees - Copeland's of New Orleans, Inc., the Succession of William A. Copeland III, and Alvin C. Copeland, Jr.**

THIBODEAUX, Chief Judge.

Plaintiffs, BCM, L.L.C. and Nawlins Kajun Foods, L.L.C., appeal the trial court's decision to grant summary judgment in favor of Copeland's of New Orleans, Inc. The trial court determined that plaintiffs' claim under the Louisiana Unfair Trade Practices Act had prescribed and that they did not sufficiently prove the elements of their intentional interference with contract claim. We affirm the judgment of the trial court.

## I.

## ISSUES

We must determine whether BCM and Nawlins' claims under the Louisiana Unfair Trade Practices Act are time-barred. We must also consider whether BCM and Nawlins have satisfied the elements of their claim for intentional interference with contract.

## II.

## FACTS

In 1994, William Gregory Baker (Baker) entered into a franchise agreement with Copeland's of New Orleans, Inc. (CNO) to open a Copeland's restaurant in Lafayette. In November of that same year, Baker transferred all of his interests in the franchise agreement to BCM, L.L.C. (BCM) with the written consent of CNO. The members of BCM were William Baker and Vikki Baiers (Baiers). Baker then persuaded others to invest in BCM. Louis Viviano (Viviano), via his entity, LAF Foods, Inc. (LAF), purchased a 30% interest in BCM and later transferred this interest to CBC International, Inc. (CBC), another Viviano entity. Walter Glod (Glod) purchased a 15% interest in BCM. Baker and Baiers each retained a 27.5%

1

interest in BCM. Baker and Baiers later transferred their individual interests in BCM into two wholly-owned enterprises, respectively Greg Baker Enterprises, Inc. (GBE) and VLB, Inc. (VLB). Thus, GBE, VLB, and Viviano via CBC owned portions of BCM, which owned the interests in the franchise agreement.

The Copeland's restaurant in Lafayette opened in September of 1995. During the opening, Al and Bill Copeland met Viviano. An October article in the New Orleans Times-Picayune reported on the opening and identified Viviano as one of the owners. In addition, a CNO press release announcing the opening referred to "Baker and fellow owners." The restaurant was a success, and Baker wished to open a Copeland's franchise in Orlando. In 1996, CNO entered into a second franchise agreement with Baker and an entity named Nawlins Kajun Foods, L.L.C. (Nawlins) to open the Orlando venue. Viviano, via CBC, had purchased a 1/3 interest in Nawlins. Baker and Baiers each controlled the remaining 2/3 of Nawlins. Viviano loaned $450,000 to Nawlins so that Nawlins could purchase furniture, fixtures, and equipment for the Orlando site. In addition, Viviano purchased individual notes from Nawlins totaling over $1 million. The Orlando restaurant opened in September 1996. At the opening, Al and Bill Copeland again met Viviano. Bill Copeland spoke with Viviano about his investments in both the Lafayette and Orlando franchises. After the Orlando opening, Bill Copeland invited Viviano and his family to the CNO suite at the New Orleans Superdome to attend a football game.

CNO sent default letters on February 14, 1997 and March 3, 1997, notifying plaintiffs of the breach and asking them to restore ownership and control of BCM and Nawlins to their original states. After the default letters, CNO's attorneys invited Viviano to submit a franchise application. CNO rejected the application.

CNO then instituted arbitration proceedings in May, seeking termination of the franchise agreements for both the Lafayette and Orlando locations. CNO asserted that the transfer of Baker's interests in the franchises had been performed without prior written consent, as mandated by the franchise agreement. CNO also requested it be allowed to assume the lease and take title to the furnishings, fixtures, and equipment. On September 30, 1997, the arbitrator issued an award terminating both franchise agreements, with termination to be effective thirty days following the date of the award. On October 6, after the arbitrator rendered his award, CNO obtained a temporary restraining order allowing it to operate the restaurants pending an injunction hearing. On October 15, 1997, the court dissolved the temporary restraining order. On November 18, 1997, CNO filed a petition to modify the arbitration award to allow CNO to purchase the franchisees' furnishings, fixtures, and equipment and to recognize CNO's contractual right to assume the lease. The district court, however, confirmed the arbitration award in its entirety on January 27, 1998. On March 2, 1998 and April 17, 1998, CNO filed involuntary bankruptcy proceedings against the former franchisees. These proceedings were later closed by the bankruptcy court.

On January 29, 1998, with an amendment on September 13, 2001, BCM and Nawlins, owned in various proportions by Baker, Baiers, Viviano and Viviano entities, sued CNO, as well as Al and Bill Copeland, alleging unfair trade practices under the Louisiana Unfair Trade Practices Act and intentional interference with contract. On March 10, 2004, CNO filed a motion for partial summary judgment seeking dismissal of plaintiffs' claims. The trial court granted the motion for summary judgment, finding that plaintiffs' claim under the Louisiana Unfair Trade Practices Act had prescribed and that they did not sufficiently prove the elements of

their intentional interference with contract claim. BCM and Nawlins appeal the dismissal of their claims.

III.

## LAW AND DISCUSSION

### *Unfair Trade Practices*

Plaintiffs BCM and Nawlins argue that CNO's conduct in terminating the franchise agreements amounts to a violation of the Louisiana Unfair Trade Practices Act. They assert that CNO, knowing that the restaurants needed outside financial assistance, enticed Viviano to invest in the franchises by leading him, through their silence, to believe CNO approved of his involvement. Once the restaurants were successful, CNO attempted to appropriate them by placing plaintiffs in default and instituting arbitration proceedings to terminate the franchises and assume control of the property, equipment, and leases.

Louisiana Revised Statutes 51:1409(E) states that unfair trade practice claims prescribe one year from the time of the event which gives rise to the claim.[1] The initial act which indicates the possibility for a claim of unfair trade practices is the first default letter, February 14, 1997. Therefore, while the suit is timely, all of the acts before January 29, 1997 are perempted and cannot be used to support a claim for unfair trade practices. These perempted acts include: the meetings between Al and Bill Copeland and Viviano at the Lafayette and Orlando openings; their meetings at the football game; any conversations that might have occurred between them at these events; the Times-Picayune news article; and the CNO press release.

_____

[1]The opinion in *Tessier v. Moffatt*, 93 F.Supp.2d 729, 737 n.6 (E.D.La. 1998), points out that "Section 15:1409 contains the word 'prescribed,' not 'perempted.' LUTPA was enacted in 1972, ten years before the article which defined peremption."

Plaintiffs argue, however, that the peremptive period should not begin to run until the date the arbitrator terminated the contract, at the latest, October 30, 1997.[2] For support, they rely on *Tubos de Acero de Mexico, S.A. v. American International Investment Corp.*, 292 F.3d 471 (5th Cir. 2002). There, the Fifth Circuit held that the peremptive period for unfair trade practices did not begin to run until the lease terminated. At the hearing on the summary judgment motion, plaintiffs argued to the trial court that CNO's scheme to take over the franchises was an ongoing, continuing tort that prevented the peremption period from running until the last act was committed. We must, therefore, consider whether the peremption period contained in the Louisiana Unfair Trade Practices Act can be suspended or interrupted by a continuing tort.

The fourth circuit explored the impact of a continuing tort on the LUTPA peremption period in *Canal Marine Supply, Inc. v. Outboard Marine Corp.*, 522 So.2d 1201 (La.App. 4 Cir. 1988). The court noted that, in general, "if the statute which creates a right also provides the time period in which that right must be exercised, the period is viewed as peremptive." *Id*. at 1203. The statute includes a fixed time period in which the right must be exercised. Thus, the period is peremptive. LUTPA "created a cause of action which did not exist in Louisiana before 1972." *Id.* The court also analyzed the intent of the legislature in drafting the statute and noted that LUTPA "is intended to protect the *public's* interest in fair trade." *Id.* In addition, LUTPA is essentially penal in nature, as demonstrated by its provisions for attorney fees and treble damages. The court noted that "[b]ecause the statute is penal in nature, it is subject to reasonably strict construction." *Id.* The court

_____

[2]The arbitration award terminated the contract effective thirty days from the date of the award, September 30, 1997.

5

concluded that the novel and unique nature of the cause of action and the heightened damages awarded in a successful action

> militate in favor of an absolute, uninterruptible time period. The UTPA's provision for triple damages is in derogation of the ordinary rules on damages. Likewise, the right of a private individual to bring suit under the UTPA is a special feature . . . . By including a provision setting forth the time in which the private right of action must be asserted, the legislature showed an intent to remove this unique right from the ordinary rules of prescription. The plain language of R.S. 51:1409 E. shows an intent to make that period absolute (that is peremptive). . . . There is no qualifying language attached to this [time limit]. If the legislature had wanted this time period to be interruptable it could either have said so specifically or have let the ordinary rules of prescription apply by not making special provision for it in the act.

*Id.* at 1203-04.

A strong line of Louisiana jurisprudence follows this interpretation, despite some disagreement from the Federal Fifth Circuit. Because the third circuit has adhered to the general rule that peremption cannot be interrupted or suspended, we decline to follow the line of cases that permit such an exception where there is a continuing tort.

Louisiana Civil Code Article 3458 defines peremption as a period of time during which a right can be exercised and provides that "[u]nless timely exercised, the right is extinguished upon the expiration of the peremptive period." The Louisiana Supreme Court explained that peremption "totally destroys the previously existing right with the result that, upon expiration of the prescribed period, a cause of action or substantive right no longer exists to be enforced." *Pounds v. Schori*, 377 So.2d 1195, 1198 (La.1979).

The Civil Code itself does not contemplate any exceptions to this rule. Louisiana Civil Code Article 3461 states that "[p]eremption may not be renounced,

interrupted, or suspended." The third circuit refused to relax the strict construction of peremption in *Dauterive Contractors, Inc. v. Landry & Watkins*, 01-1112 (La.App. 3 Cir. 3/13/02), 811 So.2d 1242. Dauterive argued that in case of a continuous tort, prescription does not begin until the conduct causing the damage stops. The third circuit agreed that although "continuous tortious conduct . . . may suspend *prescription*, we note again that the pertinent time limitation in this case is *peremptive*. Peremption may not be suspended." *Id*. at 1259 (emphasis added); *see also Bel v. State Farm Mut. Auto Ins. Co.*, 02-1292, p. 7 (La.App. 1 Cir. 2/14/03), 845 So.2d 377, 382 (citing *Saia v. Asher*, 01-1038 (La.App. 1 Cir. 7/10/02), 825 So.2d 1257), *writ denied*, 03-733 (La. 5/30/03), 845 So.2d 1057 (finding that where a "time limitation . . . is peremptive, and the principle of continuing torts is a suspensive principle, ineffective against the effects of peremption, we find the continuing tort doctrine inapplicable").

Several federal district court opinions have adopted this reasoning, even before the fourth circuit decided *Canal Marine*. The opinion in *Cason v. Texaco, Inc.*, 621 F.Supp. 1518, 1523 (M.D.La. 1985), stated that the penal nature of LUTPA required a strict interpretation of the statute. Section 1409(E) "clearly and expressly" provides a one-year time limit in which an action may be brought. *Id.* The court found, however, that strict construction prohibited application of the doctrine of continuing violation to prevent the commencement of the running of "prescription." *Id.*

Other federal courts rely on *Canal Marine* for the proposition that "the UTPA establishes a peremptive period which may not be tolled or interrupted." *Neill v. Rusk*, 745 F.Supp. 362, 364 (E.D.La. 1988); *Safford v. Painewebber, Inc.*, 730 F.Supp. 15 (E.D.La. 1990) (finding that the doctrine of *contra non valentem* does not

7

apply to a peremptive period, so that unfair trade practices occurring more than one year before suit was filed were time-barred). In *Neill v. Rusk*, Neill alleged that Rusk conspired to eliminate him from participation in a joint venture agreement. Neill stated that the unfair trade practices began during the joint venture in 1985, but he did not learn of the scheme until 1987, when he received a copy of a licensing agreement. The court cited *Cason* in concluding that the peremptive period in La.R.S. 51:1409(E) "cannot be enlarged by application of the doctrine of continuing violation." 745 F.Supp. at 365. The court reasoned:

> [T]he fact that Neill was allegedly unaware of his cause of action under the UTPA until receipt of the . . . agreement . . . cannot serve to toll the one-year period. While a prescriptive period may be interrupted, peremptive periods . . . are not subject to interruption or suspension, even under the doctrine of [*contra non valentem*].

*Id.*

Louisiana appellate courts have also observed this line of reasoning. *Spencer-Wallington, Inc. v. Service Merchandise, Inc.*, 562 So.2d 1060, 1063 (La.App. 1 Cir.), *writ denied*, 567 So.2d 109 (La.1990), stated: "[T]he one year period of limitation for commencement of the action is peremptive, thus not subject to interruption or suspension even under the doctrine of *contra non valentem*." The decision cited *Canal Marine*. *See also Reed v. St. Charles Gen. Hosp.*, 01-1148 (La.App. 4 Cir. 3/27/02), 815 So.2d 319; *Morris v. Sears, Roebuck & Co.*, 99-2772 (La.App. 4 Cir. 5/31/00), 765 So.2d 419; *Thibaut v. Thibaut*, 607 So.2d 587 (La.App. 1 Cir. 1992), *writs denied*, 612 So.2d 37, 38, and 101 (La.1993); *Dufour v. U.S. Home Corp.*, 581 So.2d 765 (La.App. 4 Cir. 1991).

Finally, in circumstances similar to *Neill v. Rusk*, the third circuit reviewed a case in which a plaintiff, Mayo, sued defendants under LUTPA for selling him immovable property which defendants did not own. *Mayo v. Simon*, 94-590

(La.App. 3 Cir. 11/2/94), 646 So.2d 973. The court acknowledged that Mayo did not discover the defective title until several years after the date of the deed transaction, which was the event giving rise to the LUTPA claim. Nevertheless, the court decided that "the jurisprudence is clear that the one year period in which to bring a claim is peremptive, not prescriptive, and cannot be interrupted by contra non valentem." *Id.* at 976; *see also Kuebler v. Martin*, 610 So.2d 270 (La.App. 5 Cir. 1992).

The Federal Fifth Circuit adopted a different analysis in its opinion in *Tubos*, 292 F.3d 471. In that case, American International argued that its LUTPA claim was not time-barred because Tubos' conduct during their contract was a continuing violation that did not stop until the contract terminated. The Fifth Circuit agreed that the presence of a continuing violation extended the time in which American International could bring a claim.

The court cited three Louisiana appellate cases from the first circuit, each of which found that where there is a continuing violation of LUTPA, "the peremptive period does not begin to run until the violation ceases." 292 F.3d at 481. In *Fox v. Dupree*, 93-120 (La.App. 1 Cir. 12/29/93), 633 So.2d 612, 614, *writ denied*, 94-296 (La. 3/25/94), 635 So.2d 233, the court found that, although the one-year period in LUTPA is peremptive, plaintiff's failure to comply with bond filing and disclosure requirements constituted a continuing violation of LUTPA so that "[e]very day he was not in compliance with the law, plaintiff violated the statute." The opinion reasoned that "[t]he peremptive term could not even begin to run until a loan broker complied with the law because every day he is in violation gives rise to a new right of action for an unfair trade practice." *Id.*

Similarly, the decision in *Benton, Benton & Benton v. Louisiana Public Facilities Authority*, 95-1367 (La.App. 1 Cir. 4/4/96), 672 So.2d 720, *writ denied*, 96-

1445 (La. 9/13/96), 679 So.2d 110, held that LUTPA's peremptive period cannot begin to run as long as violations of LUTPA continue. That case cited *South Central Bell Telephone Co. v. Texaco, Inc.*, 418 So.2d 531, 533 (La.1982), in which the supreme court decided that "[w]hen . . . tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damages is abated." However, *Dauterive*, 811 So.2d 1242, clarified this point by distinguishing prescription, which can be interrupted, and peremption, which cannot. In fact, *Dauterive* specifically rejected the use of *South Central Bell Telephone* to justify suspending peremption. Similarly, *Capitol House Preservation Co. v. Perryman Consultants, Inc.*, 98-2216 (La.App. 1 Cir. 11/5/99), 745 So.2d 1194, *writ denied*, 99-3446 (La. 2/11/00), 754 So.2d 937, the final case on which *Tubos* relied, depended on the identical use of *South Central Bell Telephone* to build from the suspension of *prescription* until a continuing tort has abated into the suspension of *peremption* in similar circumstances.

The cases upon which the Federal Fifth Circuit based *Tubos* come entirely from the Louisiana First Circuit Court of Appeal. In contrast, the third circuit's perspective is consistent with opinions from other state circuits, as well as federal district courts. Additionally, *Benton* and *Capitol House* depend on *South Central Bell Telephone*, which the third circuit specifically found inapplicable to peremption in *Dauterive*. Thus, the third circuit has made a jurisprudential commitment to a strict definition of peremption embodied in the Civil Code and manifested in its consistent decisions barring use of the continuing violation doctrine to suspend peremption.

The acts which occurred after January 29, 1997 do not qualify as unfair trade practices as a matter of law. These acts are: the October 1997 temporary

restraining order; the November 18, 1997 petition to modify the arbitration award; and the March and April 1998 involuntary bankruptcy proceedings.

These acts are appropriate resorts to the judicial process and not unfair trade practices. Section 15 of the franchise agreement describes the parties' respective rights and obligations upon termination of the agreement. The franchisor has the right to assume the franchisee's occupancy rights under the lease for the restaurant and has the right to purchase furnishings, equipment, and supplies. The arbitration award terminated the franchise agreements but denied CNO the right to purchase or use any of the franchisees' furnishings, fixtures, or equipment. The temporary restraining order and petition to modify the arbitration award represent valid uses of all available judicial processes to overcome the effects of the arbitrator's decision and implement CNO's rights under the franchise agreement. CNO had a right to request a temporary restraining order until the court could review the issue. The court found that the arbitration award was binding and lifted the temporary restraining order.

Likewise, CNO's petition to modify the arbitration award alleges that the arbitrator was not asked to consider whether CNO could exercise its contractual right to purchase the franchisees' furnishings, fixtures, and equipment. Therefore, the arbitrator's ruling exceeded the scope of the parties' submission to arbitration. This is a valid objection to an arbitral award. The court reviewed CNO's petition and chose to confirm the award. Similarly, involuntary bankruptcy proceedings are usually instituted to protect a party's position as a creditor. CNO was within its rights to use legal proceedings to protect itself to the fullest extent possible.

Conduct that violates the Unfair Trade Practices Act must involve fraud, misrepresentation, deception, or unethical conduct. *JCD Mktg. Co. v. Bass Hotels &*

*Resorts, Inc.*, 01-1096 (La.App. 4 Cir. 3/6/02), 812 So.2d 834. In *Cajun Restaurant & Bar, Inc. v. Maurin-Ogden 1978 Pinhook Plaza*, 574 So.2d 536 (La.App. 3 Cir. 1991), Maurin-Ogden sued Cajun for past-due rent and obtained a judgment in its favor. The sheriff seized Cajun's property, and Maurin-Ogden purchased it. The third circuit agreed with the trial court that

> the Sheriff's sale was not part of any unfair trade practice . . . . Plaintiff seeks to ground both causes of action in the fact that defendant bid on **CAJUN RESTAURANT'S** equipment and bought it. This bidding can[not] be . . . an unfair trade practice because it was entirely permitted by our law. . . . This entirely proper use of legal process is not part of any unfair trade practice . . . .

*Id*. at 538.

The opinion concluded that "Maurin-Ogden was simply the successful bidder at a legally and properly conducted judicial sale" and that "the sheriff's sale was not part of an unfair trade practice." *Id.* at 538-39. This circuit has declined to recognize a proper exercise of judicial process as a basis for an unfair trade practices claim.

In *First National Bank of Commerce v. Brown*, 525 So.2d 672 (La.App. 1 Cir. 1988), Brown claimed FNBC violated the Louisiana Unfair Trade Practices Act by suing him in an improper venue to harass him. The appellate court dismissed Brown's claim for damages and attorney fees, stating that La.R.S. 51:1409 "does not concern itself with filing suit in a court of improper venue." 525 So.2d at 674. In contrast, plaintiffs rely on *Bank of New Orleans & Trust Co. v. Phillips*, 415 So.2d 973, 975 (La.App. 4 Cir. 1982), which found that "the intentional, knowledgeable filing of suit in the wrong venue is an unfair trade practice within the contemplation of R.S. 51:1401" to show that intentional use of the judicial process to harass a party can be an unfair trade practice in violation of the Act. In this case, however, plaintiffs have offered no evidence that suggests CNO intended its resort to judicial process to

harass them. CNO's actions do not incorporate misrepresentation, deception, or unethical conduct.

### *Intentional Interference with Contract*

Plaintiffs assert the trial court wrongfully granted summary judgment dismissing their claim for intentional interference with contract. The Louisiana Supreme Court recognized the existence of a tort claim for intentional interference with contract in *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La.1989). That case set forth the elements a plaintiff must satisfy to establish such a claim:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*Id*. at 234.

Although the parties do not dispute the first element, there is disagreement as to whether or not Bill Copeland acted as an officer or director of CNO. Plaintiffs note that *Spurney* and subsequent cases include those persons with a fiduciary relationship to the corporation among those subject to liability for intentional interference with contract. For instance, in *Communication & Information Resources, Inc. v. Expressions Acquisition Corp.*, 95-1070 (La.App. 5 Cir. 5/15/96), 675 So.2d 1164, the appellate court found that, although the defendant was not a corporate officer, he was a member of the board of directors of the relevant companies and consequently owed them a fiduciary duty. Therefore, the court held that the defendant was "within the ambit of *Spurney* and [could] be held liable for

13

intentional interference with contract." *Id.* at 1169; *see also Krebs v. Mull*, 97-2643 (La.App. 1 Cir. 12/28/98), 727 So.2d 564 (holding that defendant's agreement to act as co-counsel with plaintiff created a duty of fair dealing and honesty that prohibited defendant's interference with an attorney-client contract), *writ denied*, 99-262 (La. 3/19/99), 740 So.2d 119. Plaintiffs rely on Al Copeland's deposition testimony, in which he identified his brother Bill Copeland as responsible for franchise applications and stated "he's pretty much in charge of franchising completely." Assuming, however, that plaintiffs are able to prove this element of *Spurney*, they did not adequately show they would be able to prove the remaining *Spurney* factors.

At oral arguments on the summary judgment motion, the trial court asked exactly what CNO did to induce plaintiffs to violate the franchise agreement or to make the performance of the contract more difficult, which is the third *Spurney* factor. Plaintiffs first assert that CNO did not inform the parties to the franchise agreements that plaintiffs' failure to obtain consent to the transfers of ownership constituted a breach of contract. According to plaintiffs, CNO knew that Viviano had invested in the franchises, knew that this investment violated the franchise agreement because it had not been approved by CNO, but failed to apprise Viviano of the violation. CNO's lack of objection led plaintiffs to believe CNO approved of Viviano's part ownership of the franchise agreement.

CNO, however, did not cause the plaintiffs to make the transfers without obtaining its permission. The arbitrator determined that the franchisees, and not the franchisors, breached the agreement. Plaintiffs argue that the arbitrator determined only that the agreement had been breached and that, as a result, CNO was entitled to terminate; there was no finding that CNO's conduct relating to the agreement was proper. However, the issue before the arbitrator was whether or not CNO had the

14

right to terminate the franchise agreement because plaintiffs failed to obtain permission to transfer ownership interests in the agreement; the arbitrator was not asked to consider whether or not the parties otherwise acted appropriately in their contractual relationship.

In *WKG-TV Video Electronic College, Inc. v. Reynolds*, 92-487 (La.App. 1 Cir. 4/23/93), 618 So.2d 1023, the appellate court affirmed a finding of intentional interference with contract. In that case, the defendant "manufactured" reasons to prevent a sale from occurring. The defendant actively concealed information from the prospective buyer about his negotiations with another party. *Id.* In this case, however, plaintiffs did not show CNO prevented them from obtaining copies of the franchise agreement, or otherwise hampered their access to the contents of the agreement. Additionally, Baker obtained approval from CNO for the initial transfer of his interest in the franchise agreement from an individual holding to BCM, so at least Baker was aware approval was necessary.

Second, plaintiffs argue that CNO's refusal to approve the acquisition retroactively rendered contractual performance impossible. CNO, however, had no obligation to approve retroactively plaintiffs' acquisition of the interest. Under § 13.3 of the Franchise Agreements, CNO had a duty not to unreasonably withhold its consent to a transfer. However, the franchise agreement only contemplated CNO in the position of having to approve a transfer before it was completed. This enables the franchisor to review the transfer and determine whether the transferee was suitable to participate in the franchise. Thus, the duty not to unreasonably withhold consent would attach only before a transfer.

CNO is not required to negate all of the elements of plaintiffs' claim of intentional interference with contract. It is required to show only "an absence of

15

factual support for one or more elements essential to the [plaintiffs'] claim, action, or defense." La.Code Civ.P. art. 966(C)(2). CNO has. In our view, BCM, L.L.C. and Nawlins Kajun Foods, L.L.C., have failed to come forward with factual evidence to show they would be able to satisfy the third, fourth, and fifth elements of *Spurney*. Thus, summary judgment was properly granted to CNO on the intentional interference with contract claim.

IV.

**CONCLUSION**

For the above reasons, the judgment of the trial court is affirmed. Costs of appeal are assessed to appellants, BCM, L.L.C. and Nawlins Kajun Foods, L.L.C.

**AFFIRMED.**

16

WALTER A. GLOD, JR., M.D.

VERSUS

W. GREGORY BAKER, ET AL.

PETERS, J., dissenting.

I respectfully disagree with the majority's opinion in this matter. I would reverse the trial court's grant of the summary judgment and remand the matter for further proceedings.

The trial court dismissed the causes of action raised by BCM, L.L.C. and Nawlins Kajun Foods, L.L.C. (plaintiffs) based on the Louisiana Unfair Trade Practices Act (LUTPA) and intentional interference with contractual relations and did so in the context of a summary judgment. In affirming the trial court's judgment, the majority concludes that all pre-January 29, 1997 LUTPA acts relied upon by the plaintiffs are preempted; that all post-January 29, 1997 LUTPA acts are, as a matter of law, not actionable; and that the plaintiffs cannot satisfy the elements of proof required for an intentional interference with contract claim.

Addressing the LUTPA ruling first, I agree with the majority's conclusion that all acts that occurred before January 29, 1997, which could otherwise be used to support a claim under LUTPA, are preempted. However, I find that none of the pre-January 29, 1997 acts in and of themselves that were asserted by the plaintiffs would support a claim under LUTPA. In fact, these acts actually benefited the plaintiffs in that Copeland's of New Orleans, Inc. (Copeland's) acquiesced in the plaintiffs' failure to obtain the proper approvals under the franchise agreement. Had Copeland's

continued to acquiesce, and certainly it had the right to do so, no litigation would have been forthcoming.

Where I disagree with the majority is in the determination that the acts occurring after January 29, 1997, do not form the basis for a cause of action under LUTPA. The majority acknowledges that the plaintiffs' January 29, 1998 suit is timely for all acts occurring after January 29, 1997, and identifies three such acts: (1) the acquisition by Copeland's of the October 1997 temporary restraining order, (2) the filing by Copeland's of the November 18, 1997 petition to modify the arbitration award, and (3) the filing by Copeland's of the March and April 1998 involuntary bankruptcy proceedings. The majority then concludes, as a matter of law, that these do not constitute LUTPA violations. Notably, the majority does not even consider the impact on the LUTPA issues of Copeland's actions in sending the February and March 1997 default letters.

As stated, this matter is before us on the grant of a summary judgment. We review summary judgments *de novo* under the same criteria that govern the trial court's consideration of whether to grant or reject a motion for summary judgment in a particular case. *Cormier v. Albear*, 99-1206 (La.App. 3 Cir. 2/2/00), 758 So.2d 250. The summary judgment procedure is now favored in the law and "is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969." La.Code Civ.P. art. 966(A)(2). If there is no genuine issue as to material fact and the mover is entitled to judgment as a matter of law, the motion for summary judgment "shall be granted." La.Code Civ.P. art. 966(C)(1). Thus, despite the fact that summary judgments are now favored in the law, the existence of genuine issues of material fact precludes the grant of such relief.

2

In the matter now before us, I am concerned that the trial court and the majority of this court reached their respective conclusions by resolving genuine issues of material fact. Louisiana Revised Statutes 51:1405(A) makes unlawful all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The language of that statute is intended to be broad, and whether a particular act constitutes an unfair trade practice is to be determined on a case-by-case basis on the facts of each case. *Bobby & Ray Williams P'ship, L.L.P. v. Shreveport La. Hayride Co.*, 38,224 (La.App. 2 Cir. 4/21/04), 873 So.2d 739, *writ denied*, 04-1215 (La. 10/8/04), 883 So.2d 1022; *Jarrell v. Carter*, (La.App. 1 Cir.), *writ denied*, 582 So.2d 1311 (La.1991). However, factual determinations in the context of a particular situation are reserved for a trial on the merits and are not to be determined in a summary judgment proceeding.

The cause of action afforded a private citizen under La.R.S. 51:1409(A) is triggered when the person "suffers any ascertainable loss of money." In the matter before us, that did not occur until Copeland's issued the February and March 1997 default letters. The supreme court explained the cause of action concept in *Everything on Wheels Subaru, Inc. v. Subaru South, Inc.*, 616 So.2d 1234, 1283, as follows:

> In *Trahan v. Liberty Mutual Insurance Company*, 314 So.2d 350, 353 (La.1975), this court defined cause of action as "an act by a defendant which gives a plaintiff a right to invoke judicial interference on his behalf." The court pointed out the difference between a demand, which is "the object of the suit," and a cause of action, which is "the state of facts which gives a party a right to judicially assert an action against the defendant." Thus, cause of action, as used in the context of the peremptory exception, means the operative facts which give rise to the plaintiff's right to judicially assert the action against the defendant.

(Footnotes omitted.)

3

In the matter now before us, the plaintiffs had no right to invoke judicial interference on their behalf until February of 1997. Suit was filed within one year of that time.

Additionally, I find nothing in LUTPA that provides as a matter of law that judicial proceedings cannot be the basis of a LUTPA suit. As stated in *Jarrell*, 577 So.2d at 123, "[i]t has been held that a practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious." In that regard, the basic material factual dispute revolves around the state of mind of those representing Copeland's. State of mind issues often involve matters such as fraud, misrepresentation, and deception. While I recognize that the supreme court in *Jones v. Estate of Santiago*, 03-1424 (La. 4/14/04), 870 So.2d 1002, acknowledged that there are situations in which motive, intent, good faith, knowledge, or malice can be considered in a summary judgment context, it limited such considerations to situations in which no issue of material fact exists regarding such intent. The supreme court further explained that such determinations are "seldom appropriate" in a summary judgment situation. *Id.* at 1006.

In this matter, we are clearly left with genuine issues of material fact, and Copeland's in not entitled to dismissal of the plaintiffs' LUTPA cause of action as a matter of law.

For the same reasons set forth above, I disagree with the trial court's and the majority's determination that the plaintiffs cannot be successful in establishing the elements required by *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La.1989). To reach such a conclusion, the trial court and this court were required to make factual determinations prohibited in a summary judgment proceeding.

I would reverse the grant of the summary judgment with regard to both causes

4

of action and remand this matter to the trial court for further proceedings.

NUMBER 04-1483
C/W 04-1484, 04-1485, 04-1486

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

WALTER A. GLOD, JR., M.D.

VERSUS

W. GREGORY BAKER, ET AL.

AMY, J., concurring.

I agree that an affirmation is required. With regard to claims allegedly arising under the Louisiana Fair Trade Practices Act, I find that they were either perempted or without merit and, therefore, subject to dismissal through summary judgment. Like the lead opinion, I find the continuing tort doctrine inapplicable as the limitation period at issue is one of peremption rather than prescription. Peremptive periods cannot be interrupted or suspended and application of the continuing tort doctrine to the period would do just that. Absent the continuing tort theory, each action must be viewed as individual and should be recognized as beginning its own peremptive period. Simply, as suit was filed on January 29, 1998, it was not timely as to any action occurring prior to January 29, 1997. Any actions occurring after that date do not constitute LUTPA violations and were, therefore, appropriate for summary judgment.